Filed 5/18/15  P. v. Godwin CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064909 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF25781) |
| JEREMY JAMES GODWIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge.  Affirmed as modified.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez, and Lynne G. McGinnis, Deputy Attorneys General.

Jeremy Godwin appeals from a judgment convicting him of various sex offenses arising from his molestation of Jane Doe.[1] He argues there is insufficient evidence to support the jury's finding that he used duress to commit the molestation, and insufficient evidence that one of the alleged counts occurred. Further, he asserts the court erred by (1) allowing admission of the details of his prior sex offense conviction; (2) denying his mistrial motion based on stricken testimony that he fit the profile of a child molester; and (3) denying his posttrial request for disclosure of juror identifying information.

As to sentencing, defendant contends (1) the court erred in considering evidence that was excluded at trial on *Miranda*[2] grounds; (2) a $400,000 restitution award to the victim must be reversed due to a violation of the *Apprendi*[3] rule and insufficiency of the evidence, and (3) the trial court should have dismissed, rather than stayed, sentences imposed under the Habitual Sex Offender statute.

We find no reversible error except for defendant's challenge to his habitual sex offender sentences. Because the trial court sentenced defendant under the One Strike sex offender scheme, we agree the habitual sex offender sentences should be dismissed. We modify the judgment to dismiss the habitual sex offender sentences, and as so modified affirm the judgment.

---

[1]     We refer to the victim as Jane Doe to preserve her anonymity.

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

[3]     *Apprendi v. New Jersey* (2000) 530 U.S. 466.

FACTUAL AND PROCEDURAL BACKGROUND

Doe, age 20 at the time of trial, testified about numerous acts of molestation committed by her father (defendant) that started when she was a small child and continued until she was 13 years old.

Doe recalled an incident when she was "really small" when she and defendant were riding in a vehicle in the desert and defendant placed his hand between her legs and was "playing with [her] vagina . . . through [her] clothes." Consistent with this memory, Doe's mother testified that when Doe was five years old, she told her mother that defendant had been touching her "down there," pointing to her vaginal area. The matter was investigated; defendant was arrested; and in 1998 he pled guilty to committing a lewd act against Doe.[4]

Because of his 1998 lewd act conviction, defendant was removed from the family home for four years; the family received counseling; and defendant reunited with the family in about January 2002. Doe's mother testified she did not divorce defendant at this time because "[t]here was doubt," explaining that defendant told her he did not commit the molestation, "everything was just misconstrued," and he only pled guilty so she could be reunited with their children.

Doe recalled another incident that occurred when she was about nine years old and her brother was about three or four years old. On this occasion, Doe and her brother were

----

4 At the current trial, Doe did not recall the events surrounding defendant's 1998 conviction. We set forth the facts concerning this prior conviction in more detail below when describing the prior sex offense evidence admitted at trial.

3

not wearing clothes, she was on top of her brother, and her father was with them in the room. She did not remember further details, except that her brother's penis and her vagina were somehow "involved."

The remaining acts of molestation described by Doe occurred at the family's home on Cedar Avenue where they moved in July of 2002 when Doe was almost 10 years old, and at the family's home on Walnut Avenue where they moved in November 2003 when Doe was 11 years old.

During an incident at the Cedar residence, Doe woke up in the middle of the night on the couch, and defendant was "making out" with her, with his tongue in her mouth and his arms around her. The incident made her feel "uncomfortable." On another occasion, defendant performed oral sex by putting his mouth on Doe's vagina.

During an incident at the Walnut residence, Doe woke up on her parents' bed, and defendant was on top of her with his penis in her vagina. Doe felt "very violated and very upset." On another occasion he had her sit on top of a scanner and he scanned her vagina. On several occasions he woke her up so she could watch pornography with him. She felt "really uncomfortable" watching the pornographic movies, but felt "too afraid to say no."

Also, on multiple occasions at the Walnut residence defendant had Doe give him "blow jobs" when they were in his bathroom. He tried to ejaculate in her mouth; "usually, it ended up in a towel or some article of clothing"; and on one occasion he ejaculated "out on [her] chest." This conduct made Doe feel "gross," "very uncomfortable," and disgusted.

4

During another incident defendant brought a dog into his bedroom and told Doe to "get down on all fours" because he wanted to "put the dog on top of [her] and put the dog[']s penis in . . . somewhere." Doe refused, and defendant instead got "on all fours" and had the dog get on top of him. Doe felt "really grossed out."

Doe recalled several other incidents of sexual molestation at the Walnut residence, including an incident in defendant's bedroom when he put vibrators on her vagina; another incident in the bedroom when he put his finger in her vagina; and several incidents in the bedroom and living room when he would masturbate in front of her. Doe testified she did not know whether defendant molested her "every week or every month" while they lived at the Walnut residence, but she knew it happened "at least a few times in one month, and few can be anywhere from two to ten times."

Regarding her relationship with her father, Doe testified he was the primary caregiver for her and her brother. Her mother was frequently gone from home at work and they were not emotionally close. When Doe was small, she and defendant were "very close," and she loved him and he was like a friend to her. As Doe got older, she did not feel as close to him; she did not know how to feel about him; and she knew that what was occurring was not right.

Doe did not recall defendant using physical discipline with her, but she testified she was afraid of him when she was growing up because she was not "sure what he could do." She remembered an incident in which defendant tied her and her mother to the bed in his bedroom. Her father and mother engaged in loud arguments; there was a lot of shouting, slamming of doors, and slamming of hands on tables; and defendant was

5

sometimes violent. For example, on one occasion he held her mother in a headlock and on another occasion threw a chair. During the headlock incident, her mother yelled that Doe should call 911 and when Doe went to get the phone, defendant threw the phone.

Doe's mother confirmed that she was often gone from home at work, including at night, and defendant took care of the children when she was not at home. Consistent with Doe's testimony, Doe's mother testified there was always a lot of pushing, shoving, throwing of objects, and screaming between her and defendant, and during the incident when she asked Doe to call 911 defendant pulled the phone out of the wall and threw it.

Doe testified she did not know what to do about the molestation because defendant was her father and she had been taught to respect her elders; she had never gone against him because she was afraid of him; she did not know "how to go about confronting the issue"; and she was afraid to say anything to other adults because they knew her father and she was afraid there would be a "back lash" against her. She thought if she told someone, her father would find out and he would get in trouble or do something to hurt her, and people would think differently of her and not believe her.

When Doe was 14 years old, she finally told her father she would no longer engage in the sexual activity. This occurred when he asked her to go with him into the bedroom, which usually meant "something would happen"; she did not want to go; to try to coax her into the bedroom he grabbed her cat; she asked him for her cat back and hit him in the back; and she then told him she was not going to "do anything anymore" and she was "done with that kind of thing." After this, defendant stopped molesting her. Doe grew closer to her father again and felt safer, but in the back of her mind she worried and

6

was afraid the molestation would resume. She and her father did not talk about the molestation but "just swept it under the rug and pretended" it was not there.

In 2008 or 2009, when Doe was about 16 or 17 years old, her mother moved out of the family home because her parents were getting divorced. Doe was allowed to choose which parent to live with, and she chose to live with defendant. Doe testified she was "very confused" about what she should do; she "just wanted to survive and be safe"; and she elected to live with defendant because the molestation had stopped and defendant was more financially secure than her mother.

However, there was one more incident in September 2009. While Doe and defendant were in the car in the desert, he masturbated in front of her. Doe "looked away and pretended [she] wasn't there and tried to just get away from it mentally." She felt "upset and disgusted." Because of this incident and because she and her father were arguing a lot about her behavior, in October 2009 she moved in with her mother.

As Doe was growing up, she told a few people about the molestation, including her cousin, her high school boyfriend, and two close friends. Doe's cousin and boyfriend testified to confirm the disclosure. In 2010, near the time when she was graduating from high school, Doe made a full disclosure during a long conversation with her high school boyfriend. During this time period she refused to continue visiting with her father, and after an emotional confrontation with her parents during a child custody exchange in a parking lot, she asked her mother to contact the authorities so she could talk to them.

Doe testified she felt relieved after finally disclosing the molestation; when she disclosed she was not living with her father and felt safer; but she still felt vulnerable

7

because if her father "really wanted to do something, he would find a way." A child sexual assault expert testified that delayed disclosure of sexual abuse is a typical disclosure pattern for children.

Regarding the long-term psychological impact of the molestation, Doe testified, "I have tried to forget a lot of the things about what has happened . . . because it makes me feel a lot of things that I don't want to feel." She explained: "[I]t [is] very hard for me to feel kind of normal, and I feel more like there [are] some aspects of my life that aren't going to be normal, like my sex life with whoever I get married to is not going to be normal and that I am always going to have little triggers that make me remember what happened and stress me out or make me cry. I find it hard to actually speak with counselors about this kind of thing and people in general, but more so [with] counselors and therapists. I feel like I am very much going to have a lot of emotional and maybe psychological damage for the rest of my life from all of this."

*Prior Sex Offense Evidence*

In January 1998, Detective William Crisp conducted a recorded one-hour interview with defendant regarding the molestation allegation that resulted in his 1998 conviction. When Crisp asked defendant why the molestation happened, defendant responded he had an urge and he fought it all the time; it was a shameful act and he did not talk about it to anyone; there were times when the opportunity arose and he could not stop himself; and after a "certain point where once you are doing it, you just want to keep doing it." Defendant told Crisp that the molestation occurred during two periods of time between October 1996 and December 1997; it happened about eight or nine times; and it

8

included such activities as rubbing, caressing, inserting his finger in Doe's rectum, placing his penis between her thighs up against her vagina, and ejaculation. Detective Crisp provided additional details concerning what defendant said during the interview, including about the nature of his relationship with his wife, further information about when and how the molestation occurred and his feelings about it, and the measures he took to hide the sexual activity.

*Defense*

The defense presented testimony from several witnesses (including a sheriff's deputy, a social worker, and defendant's mother, brother, and girlfriend) who had contact with Doe during her childhood. These witnesses variously testified that Doe never mentioned, and on occasion denied, any further molestation after defendant's 1998 conviction, and they did not observe anything to suggest defendant was continuing to molest Doe. The defense also called a psychiatrist who testified that unsubstantiated reports of child sexual abuse are more likely to occur when there are child custody disputes.

*Jury Verdict and Sentence*[5]

For the incident with Doe and her brother, defendant was convicted of forcible lewd act on a child under age 14 between August 2000 and August 2002 (count 6). For the incidents at the Cedar residence, defendant was convicted of (1) aggravated sexual assault on a child under age 14 and at least 10 years younger than the defendant (forcible

---

[5] Defendant was tried in two trials. At his first trial, the jury acquitted him of some counts and deadlocked on others. At retrial, the jury convicted him as charged.

9

oral copulation in the bedroom, count 1), and (2) forcible lewd act on a child (kissing Doe on the couch, count 3) between July 2002 and November 2003. For the incidents at the Walnut residence, defendant was convicted of (1) aggravated sexual assault (forcible oral copulation in the bathroom, count 2), (2) two counts of forcible lewd act (penile/vaginal penetration, count 4, and ejaculation on the chest, count 5), and (3) child molestation with a prior conviction (incident with the dog, count 7) between November 2003 and August 2006.

The aggravated sexual assault by forcible oral copulation offenses (Pen. Code,[6] §§ 269, subd. (a)(4), 288a, subd. (c)(2); counts 1 and 2) and the various forcible lewd act offenses (§ 288, subd. (b)(1), counts 3 through 6) were premised on the theory that defendant committed the offenses through the use of duress.

The jury also found true that defendant was convicted of a lewd act offense in 1998 for purposes of a prior sex offense conviction allegation, One Strike sex offender allegation, habitual sex offender allegation, and prior strike allegation.

The trial court sentenced defendant to a term of 300 years to life, plus a determinate term of 34 years. The court's sentencing order included an award of $400,000 in direct victim restitution to Doe for her noneconomic losses.

---

[6]    Subsequent unspecified statutory references are to the Penal Code.

10

DISCUSSION

I.  *Sufficiency of the Evidence*

Challenging his convictions of aggravated sexual assault and forcible lewd act (counts 1 through 6), defendant asserts the record does not support that he used duress to commit the molestation.  He also argues there is insufficient evidence to support the occurrence of the count 1 incident (oral copulation in the Cedar Avenue bedroom).

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)  It is the exclusive province of the jury to determine credibility and to resolve evidentiary conflicts and inconsistencies, and we presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence.  (*Ibid.*; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)  If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding.  (*Nelson, supra*, at p. 210.)

A.  *Sufficiency of the Evidence To Show Duress*

For purposes of child molestation offenses, duress means the defendant's " 'use of a direct or implied threat of force, violence, danger, hardship or retribution sufficient to cause a reasonable person to do or submit to something that he or she would not otherwise do or submit to.' "  (*People v. Soto* (2011) 51 Cal.4th 229, 246, fn. 9, italics and brackets omitted.)  To determine the existence of duress, the totality of the circumstances

11

should be considered, including the age of the victim, the defendant's relationship to the victim, and relative size and age disparities. (*People v. Veale* (2008) 160 Cal.App.4th 40, 46-49.) " 'The very nature of duress is psychological coercion' " (*id.* at p. 48), and in the context of child molestation "it is the defendant's menacing behavior that aggravates the crime . . . ." (*People v. Soto, supra*, 51 Cal.4th at p. 243). A child under age 14 is deemed legally incapable of giving consent, and accordingly evidence showing the defendant's use of duress is not obviated by the fact that the child may have appeared to consent. (*Id.* at pp. 245-246 [the child's consent or lack thereof is immaterial; the focus is on the conduct of the defendant].)

There is sufficient evidence to support the jury's finding of duress. The sexual abuse started when Doe was a small child and continued until she was finally able to assert herself enough to confront defendant at age 14. Doe testified she found the activity "gross," "disgust[ing]," and "upset[ting]," but she was too afraid of defendant to protest the molestation, and she worried if she told someone he might hurt her. She explained she did not know what he was capable of doing, and she described his volatile and at times violent behavior, including tying her mother and her to the bed, throwing a chair, holding her mother in a headlock and pulling the phone out of the wall.

The jury was entitled to credit Doe's claims that she feared her father because of his demonstrated potential for violence, and she did not like the sexual activity but was too afraid to protest it. From this evidence, the jury could reasonably deduce that although defendant may not have overtly forced Doe to engage in the sexual activity, he psychologically coerced her by creating an atmosphere of fear within the family so that

12

she would be intimidated, compliant, and secretive about the sexual activity. This supports a finding that defendant used duress to molest Doe.

### B. *Sufficiency of the Evidence for Count 1*

Defendant argues the record does not support the jury's finding that the count 1 incident—involving an allegation of oral copulation in the Cedar residence bedroom—actually occurred.

Count 1 alleged that "on or about" between July 1, 2002 and November 19, 2003, defendant committed oral copulation in the bedroom at the Cedar residence. During direct examination of Doe, the prosecutor summarized the incidents described by Doe so far in her testimony that occurred at the Cedar residence, and when he asked if she remembered anything else, Doe responded no. After refreshing her recollection by having her read a portion of her transcribed testimony at another proceeding, Doe testified there was an incident at the Cedar residence when defendant "was giving [her] oral sex," explaining "[h]is mouth was on my vagina." When the prosecutor asked where in the Cedar house this occurred, Doe responded "I don't remember exactly where it was in the house."[7]

---

7    The colloquy was as follows: "[Prosecutor:] . . . [W]e just left off with refreshing your recollection regarding an incident that *occurred at . . . Cedar*?" [¶] [Doe:] Yes. [¶] [Prosecutor:] Can you explain to us what happened? [¶] [Doe:] There was a time when my dad was giving me oral sex. [¶] [Prosecutor:] Okay. And when you say giving you oral sex what do you mean by that? [¶] [Doe:] His mouth was on my vagina. [¶] [Prosecutor:] And where was this at? Where was [this] at in the *house on . . . Cedar*? Do you remember? [¶] [Doe:] I don't remember exactly where it was in the house. [¶] [Prosecutor:] And it was in the house? [¶] [Doe:] Yes. It was in the house. [¶] [Prosecutor:] *You don't remember what house*? [¶] [Doe:] No." (Italics added.)

13

Defendant asserts the testimony for count 1 was imprecise as to date and location. He also cites Doe's initial failure to recollect the incident and a portion of her testimony suggesting she did not remember at which house it occurred. He contends it is impossible to distinguish count 1 from the other counts and to calculate whether the charge was filed within the applicable statute of limitations period.

As to the dates of occurrence, Doe testified she was 10 years old when she lived at the Cedar residence; they lived at the Cedar residence for about one year; and they moved to the Walnut residence when she was 11 years old. Doe's mother testified the family lived at the Cedar residence from July 2002 until November 2003. Based on Doe's date of birth in August 1992, she was 10 years old between August 2002 and August 2003. This evidence, combined with Doe's testimony that there was oral copulation at the Cedar residence, supports the allegation that oral copulation occurred during the approximate dates of July 2002 and November 2003, when Doe was about 10 years old, and when the family was living at the Cedar residence. (See *People v. Jones* (1990) 51 Cal.3d 294, 316 [testimony identifying general timeframe when molestation occurred is sufficient].)

As to the location of the incident, Doe initially indicated it occurred at the Cedar residence. The fact that she could not recall in *which room* it occurred does not defeat the support for a finding that defendant engaged in oral copulation with Doe at the Cedar residence. Even though the information alleged the incident occurred in the bedroom, no such finding was needed to support the jury's verdict. Further, there was no possibility

We note the prosecutor's last question asking if she did not remember "what house" appears to be a nonsequitur, since the entire line of questioning was focused on an incident at the Cedar house.

14

the jury would convict on count 1 based on events associated with another count because count 1 was the only allegation involving oral copulation at the Cedar residence between July 2002 and November 2003. The other allegations involved different locations, time periods, and/or sexual acts.

Defendant's challenges based on Doe's initial inability to recollect the incident, and his claim that she did not know at which residence the incident occurred, are likewise unavailing. On appeal, we draw all inferences in favor of the judgment and inconsistencies in the evidence are not fatal to the verdict. (See *People v. Young, supra*, 34 Cal.4th at p. 1181.) Doe's refreshed memory of the incident is sufficient to support a finding that it occurred. Further, although there is brief testimony suggesting Doe did not remember at which house the incident occurred (see fn. 7, *ante*), her affirmative acknowledgement in another portion of her testimony that it occurred at the Cedar residence supports the verdict on count 1.

## II. *Admission of Prior Sex Offense Evidence*

Defendant argues the court abused its discretion and deprived him of a fair trial when it admitted evidence concerning the facts of his 1998 lewd act conviction. He posits that even if his prior sex offense conviction was generally relevant under Evidence Code section 1108 to prove his propensity to commit sexual offenses, the court should have admitted only the fact of his prior conviction and should not have permitted "wholesale admission" of the details underlying his conviction.

15

## A. *Background*

Prior to trial, defendant offered to stipulate to the existence of his 1998 sex offense conviction, but requested that the court exclude evidence of the facts underlying the conviction on the grounds that they were unduly remote, highly inflammatory, and more prejudicial than probative. The trial court rejected his request, finding the evidence was highly relevant under Evidence Code section 1108 to show he had a propensity to molest his daughter and it was not unduly remote or prejudicial. The court noted that admission of only the sex offense conviction could suggest defendant merely engaged in a "one-time touching," whereas defendant's statements to Detective Crisp were extremely probative to show his propensity to molest his daughter.

## B. *Governing Law*

Evidence Code section 1108 sets forth an exception to the general rule against the use of evidence of a defendant's misconduct apart from the charged offense to show a propensity to commit crimes. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159-1160.) When a defendant is charged with a sex offense, Evidence Code section 1108 allows admission of evidence of other sex offenses to prove the defendant's disposition to commit sex offenses, subject to the trial court's discretion to exclude the evidence under Evidence Code section 352. (Evid. Code, § 1108, subd. (a); *People v. Lewis* (2009) 46 Cal.4th 1255, 1286.) Evidence Code section 1108 is premised on the recognition that sex offense propensity evidence is critical in sex offense cases given the serious and secretive nature of sex crimes. (*People v. Falsetta* (1999) 21 Cal.4th 903, 918 (*Falsetta*).) When applying Evidence Code section 1108 in a particular case, a defendant's fair trial rights

16

are safeguarded by requiring the trial court to engage in a careful weighing process under Evidence Code section 352 to determine whether the probative value is substantially outweighed by the danger of undue prejudice, confusion, or time consumption. (*Falsetta*, at pp. 916-917.)

Based on Evidence Code section 1108, the presumption is in favor of the admissibility of other sex offense evidence; however, the evidence should not be admitted in cases where its admission could result in a fundamentally unfair trial. (*People v. Loy* (2011) 52 Cal.4th 46, 62; *Falsetta, supra*, 21 Cal.4th at p. 917.) When evaluating the other sex offense evidence, relevant factors include "its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission . . . ." (*Falsetta*, at p. 917.)

The Evidence Code section 352 " 'determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.' " (*Falsetta, supra*, 21 Cal.4th at pp. 917-918.) On appeal we will not disturb the trial court's ruling unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Lewis, supra*, 46 Cal.4th at p. 1286.)

C. *Analysis*

In support of his claim that the trial court should have excluded the details of his 1998 sex offense conviction, defendant argues the circumstances of the prior conviction overshadowed the evidence of the current charges and there was a significant danger the jury would convict him based on his prior misconduct rather than on the evidence concerning the current charges. He contends the details of his prior sex offense conviction were highly inflammatory; of stronger evidentiary weight than the evidence of the current charges; unduly remote; and likely to cause the jury to want to punish him for the prior offense because he was allowed to return home after his conviction.

The trial court was not required to reach these conclusions. As set forth above, at trial Doe's mother described Doe's disclosure of the molestation giving rise to the 1998 conviction, and Detective Crisp provided a detailed description of defendant's recorded statements admitting this molestation, describing how it occurred, and explaining the difficulty he had in controlling his sexual urges toward his daughter. The court could reasonably conclude that these details were highly relevant to show that defendant had a strong propensity to molest his daughter, which propensity evidence is expressly admissible under Evidence Code section 1108. As found by the trial court, if the jury was merely told that defendant had previously been convicted of molesting Doe, without the details concerning the extent of the molestation and defendant's overpowering pedophilic feelings towards his daughter, it would have been deprived of compelling evidence that supported the prosecution's charges that the molestation resumed once defendant returned to the family home. Neither the prosecutor nor the court is required

18

"to accept a stipulation that would deprive the state's case of its evidentiary persuasiveness or forcefulness." (*People v. Rogers* (2013) 57 Cal.4th 296, 329-330; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1100.)

The fact that the propensity evidence was of significant detriment to the defense case does not render it unduly prejudicial. Undue prejudice does not exist merely because highly probative evidence is damaging to the defense case, but rather arises from evidence that uniquely tends to evoke an emotional bias against the defendant or cause prejudgment of the issues based on extraneous factors. (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.) This is not a case where the prior sex offense evidence was so egregious as compared to the charged sex offenses that it might have caused the jury to convict based on the prior offenses regardless of the evidence supporting the current charges. The prior and current molestation evidence were of a similar nature, and the court reasonably found no undue prejudice arising from the highly relevant prior molestation evidence.

Also, the evidence was not unduly remote. The record shows that the prior molestation occurred when Doe was about four and five years old; thereafter defendant was out of the family home for about four years; and when he returned to the home he quickly resumed the behavior by molesting Doe when she was about nine years old. This shows a continuity of misconduct by defendant that obviates any claim of remoteness.

Finally, we reject defendant's contention that the trial court failed to engage in the required careful weighing of probative value and the potential for prejudice. The record reflects the court understood its duty and weighed the evidence under Evidence Code

19

section 352. The court did not abuse its discretion in admitting the details of defendant's prior molestation of his daughter.

### III. *Denial of Mistrial Based on Stricken Testimony*
### *that Defendant Fit Child Molester Profile*

Defendant argues the court erred in denying his motion for a mistrial after Detective Crisp twice testified that defendant fit the profile of a child molester. Although the court struck the testimony and admonished the jury to disregard it, defendant contends the testimony so infected the trial with unfairness that its prejudicial impact could not be cured.

While questioning Detective Crisp, the prosecutor asked if he remembered interviewing defendant about the 1998 molestation allegation even though it has been "quite some time" since this occurred. Detective Crisp answered yes, explaining that the interview was "disturbing"; his training in child molestation cases included learning about child molester profiles; and throughout all of his other interviews he had never met someone who "was the profile." Defense counsel objected, and the court sustained the objection, struck the last answer, and instructed the jury to disregard it.

Thereafter, at the conclusion of his questioning on direct examination, the prosecutor asked Detective Crisp if there was anything else about the interview with defendant that he remembered. Detective Crisp responded: "I knew from . . . the first few minutes of the interview, that he was fighting with himself whether to be there or not, whether to answer my questions or not. And that's why I reassured him that it was voluntarily. I want to use the words that I used earlier that were thrown out, but he fit the

profile." Defense counsel objected and moved to strike the testimony, and the court responded, "Same ruling. The jurors are asked to disregard that last portion."

Defendant thereafter moved for a mistrial based on the jury hearing the stricken testimony that he fit the profile of a child molester. The court denied the motion, finding the stricken comments did not affect the fairness of the trial, and told defense counsel that upon request it would give a pinpoint instruction reminding the jurors the testimony was stricken and they should disregard it.

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. . . . Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. . . .' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198.)

The record here shows no abuse of discretion or deprivation of a fair trial based on the trial court's denial of the mistrial motion. The jury was repeatedly told to disregard any stricken testimony, and it was given a special pinpoint instruction to remind them to disregard Detective Crisp's stricken testimony. During the instructions at the beginning of trial, the jury was told: "If I order testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose." When Detective Crisp made the two statements that defendant fit a child molester profile, the court immediately sustained defense counsel's objections, struck the testimony, and told the jury to disregard it. During the instructions just prior to deliberations, the court again told

21

the jury: "During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. . . . If I ordered testimony stricken from the record, you must disregard it and must not consider it for any purpose." Further[,] at this juncture the court gave the special pinpoint instruction stating: "During the testimony of prosecution witness [r]etired Detective Brad Crisp, I ordered portions of the testimony stricken from the record. You must disregard those portions of testimony and must not consider that testimony for any purpose." We presume the jurors followed these repeated admonitions to disregard stricken testimony. (*People v. Cox* (2003) 30 Cal.4th 916, 961.)

We are not persuaded by defendant's contention that Detective Crisp's statements that defendant fit a child molester profile were so prejudicial that the effect of the testimony could not be cured. The trial court could reasonably assess that given the evidence properly presented to the jury, the profile statements were of minor significance. The jury knew that defendant had admitted to molesting Doe when she was about five years old, and heard detailed testimony to support that he resumed the molestation when Doe was about nine to 13 years old upon his return to the family home. Thus, the jury was presented with extensive evidence showing defendant's pattern of ongoing molestation. Further, this is not a case where the jury was exposed to a lengthy delineation of inadmissible profile evidence. (See, e.g., *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1081-1084.) Rather, Detective Crisp's references to a child molester profile were brief and nondescriptive, and the jury was quickly admonished not to consider them.

Although Detective Crisp's repeat of testimony that had been stricken is not to be condoned, the trial court reasonably concluded that his passing references to defendant fitting a child molester profile did not undermine the fairness of defendant's trial.

IV. *Posttrial Denial of Request for Juror Identifying Information*

Defendant asserts the trial court erred by denying his posttrial request for identifying information for the jurors so his counsel could investigate whether the jury was impacted by juror misconduct.

A. *Background*

*Questioning of Juror No. 4 During Jury Deliberations*

After the first day of jury deliberations (a Friday) and when the jury had been dismissed for the weekend, two jurors stayed behind in court, indicating that they wanted to talk to the court. The court instructed the bailiff to tell them to put their concerns in writing. Each juror wrote the court a note, stating that Juror No. 4 had overheard the victim speaking to others in the hallway; Juror No. 4 was having difficulty being objective; and although Juror No. 4 was "trying his best to be honest [and] fair" he was finding it hard to " 'unring the bell.' "[8] The court told counsel it would thank the two jurors for the notes and dismiss them for the weekend, and when the proceedings resumed it would question Juror No. 4 to determine if he "has been compromised."

_____

[8]     One note said: "During deliberations Juror 4 (I believe) had overheard [Doe] speaking to others in the hall during the trial. Now he is having difficulty, it seems, being objective with the facts of what he heard. He is trying his best to be honest and fair but has used the term 'finding it hard to unring the bell' when talking about it." The other note said: "One of the jurors has admitted to overhearing the victim speaking about the case in the hallway. He is struggling to remain objective during deliberation."

23

Defense counsel responded that he would like the court to also "inquire whether the jurors have been tainted if he made any comments other than he can't be fair." The court stated it was "reluctant to get any detail, especially at this juncture."

When the proceedings resumed on Monday, the court told counsel it would question Juror No. 4, and counsel could submit any questions to the court that they wanted the court to ask. When Juror No. 4 was brought into the courtroom, the court told him that it had received information that he may have "overheard something by . . . [Doe] in the hallway," and asked if this was true. Juror No. 4 said that when he walked out of the jury room to get some water, he heard "one of the persons say, 'You should say this because he's going to say this.' " Juror No. 4 then "turned right back around and went inside." The court asked, "So is that basically the extent of what you heard?" and Juror No. 4 answered yes. The court pointed out that the instructions tell the jurors to disregard anything they might hear from a party or witness other than when court is in session, and asked Juror No. 4 if he was "having any trouble disregarding it." Juror No. 4 responded, "No, not at all." Satisfied with this response, the court directed the jury to resume deliberations, including Juror No. 4.

The court told counsel that in its view the inquiry was sufficient; Juror No 4 was not troubled by what he inadvertently overheard and was following the instruction to disregard it; the court did not believe it was "in any . . . way affecting the jury"; and if it did affect the jury it would be to the prosecution's detriment by suggesting someone was telling the complaining witness to say certain things that might not be true. When the court asked if there was any motion or other action it should take, both the prosecutor and

24

defense counsel responded no. Defense counsel elaborated, "It just appears from Juror Number 4's statement that he didn't hear the substance of what was indicated. So I agree with the Court. I believe he can be fair."

*Posttrial Request for Juror Identifying Information*

After the jury returned its guilty verdict, defense counsel filed a motion requesting disclosure of the jurors' addresses and telephone numbers so he could interview them and determine if there were grounds for a new trial motion based on the juror misconduct reflected in the two notes from the jurors concerning Juror No. 4. Defense counsel stated it was never established who instructed Doe regarding what Doe should say, and he needed to interview the jurors to ascertain "exactly what transpired in the jury room," including information about how adamant Juror No. 4 was that he could not be fair, exactly what he told the other jurors he overheard, and how his statements impacted the ability of each juror and the jury as a whole to be fair.

The court denied the motion for release of juror identifying information, finding defendant had not made a prima facie showing of good cause for disclosure. The court stated its questioning of Juror No. 4 revealed no juror misconduct had occurred, and the "vague non-specific suppositions" of the other two jurors were "effectively put to rest" by the court's questioning of Juror No. 4, whom the court found to be credible. Further, defense counsel had the opportunity to submit questions to Juror No. 4, acknowledged that Juror No. 4 had not heard any substantive information, agreed that Juror No. 4 could be fair, and did not request further inquiry or that Juror No. 4 be removed.

25

## B. *Relevant Law*

To protect a juror's right to privacy, a court is not allowed to release juror identifying information unless specific statutory requirements have been satisfied. (See *People v. Carrasco* (2008) 163 Cal.App.4th 978, 989-990.) The defendant must make a prima facie showing of good cause for disclosure, and if this requirement is met and there is no compelling reason against disclosure, the court must set the matter for a hearing where jurors can protest the disclosure. (Code Civ. Proc., § 237, subds. (b), (c).) To meet the initial prima facie burden, the defendant must make a "'sufficient showing to support a reasonable belief that jury misconduct occurred, . . . and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial.'" (*Carrasco, supra*, at p. 990; Code Civ. Proc., § 206, subd. (g); see *People v. Johnson* (2013) 222 Cal.App.4th 486, 497.)

The right to an impartial jury requires that the jury decide the case solely on the evidence adduced at trial and that it not be influenced by any extrajudicial communications. (*People v. Cissna* (2010) 182 Cal.App.4th 1105, 1115.) The existence of juror misconduct, including the inadvertent receipt of extrajudicial information, creates a rebuttable presumption of prejudice; the presumption is rebutted if the record shows "'there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment.'" (*People v. Gamache* (2010) 48 Cal.4th 347, 397-398; *In re Hamilton* (1999) 20 Cal.4th 273, 295-296.) The likelihood of juror bias must be substantial; the courts do not reverse a jury verdict merely because there is some

possibility a juror was improperly influenced. (*People v. Danks* (2004) 32 Cal.4th 269, 305.)

If the record shows that investigation of alleged juror misconduct would not reveal anything prejudicial, the trial court may deny the petition for disclosure of juror identifying information. (*People v. Box* (2000) 23 Cal.4th 1153, 1222-1223.) On appeal, we defer to the court's credibility resolutions and review the court's disclosure ruling under the deferential abuse of discretion standard. (*People v. Pride* (1992) 3 Cal.4th 195, 260; *People v. Carrasco, supra*, 163 Cal.App.4th at p. 991.)

## C. *Analysis*

Here, two jurors told the court that Juror No. 4 heard communications with Doe in the hallway, and although he was trying to be fair, he was struggling to be objective. The two reporting jurors did not indicate that Juror No. 4 had told any jurors the *contents* of what he overheard, and the two jurors made no suggestion that they, or any other jurors, had been exposed to information that affected their impartiality. Rather, their sole concern was with the difficulties of Juror No. 4. When the court questioned Juror No. 4, he assured the court he had disregarded the statements he had heard, and the court credited this assurance. When the court asked counsel if they wanted the court to do anything further, both counsel responded no, and defense counsel explicitly stated he thought Juror No. 4 could be fair.

From the information received from the two jurors who reported their concerns and the questioning of Juror No. 4, the trial court could reasonably assess that Juror No. 4 was not exposed to anything that ultimately overwhelmed his ability to be impartial. The

27

court could deduce that the difficulties observed on Friday by the two reporting jurors were resolved by Juror No. 4 (who was reportedly trying hard to be impartial) by the time the court questioned him on Monday. This is supported by the fact that neither the prosecutor nor defense counsel expressed any concerns about Juror No. 4 after the court questioned him.

As to the matter of the jury's impartiality as a whole, the court could consider that if Juror No. 4 had conveyed any information to the other jurors that might have affected their ability to be fair, the two reporting jurors would have apprised the court of this concern given the diligence with which they reported their concerns about Juror No. 4. The failure of the two reporting jurors to raise any concerns about the impartiality of the jury as a whole supports that Juror No. 4's statements to the jury had no effect on anyone but him. This conclusion is supported by the fact that although defense counsel initially requested that the court inquire about the impact on the other jurors, he did not renew this request after the court questioned Juror No. 4. Although defense counsel filed a *posttrial* motion seeking to further explore the matter, his failure to raise any concerns at the time Juror No. 4 was questioned suggests that Juror No. 4's demeanor and responses satisfied him that there had been no impact on the impartiality of the jury.

Although additional questioning of Juror No. 4 and/or other jurors would have been helpful to create a more complete record, the court and counsel's handling of the matter revealed sufficient information to rebut the presumption of prejudice arising from Juror No. 4's exposure to extrajudicial information. The court reasonably found that defendant did not make a prima facie showing of prejudicial juror misconduct, and

28

accordingly did not abuse its discretion in denying the request for disclosure of juror identifying information.

## V. *Sentencing Issues*

### A. *Sentencing Court's Consideration of Evidence Excluded at Trial on* Miranda *Grounds*

Defendant argues that when making its sentencing decisions, the court erred by considering his pretrial admission that he molested his daughter, which had been excluded from the prosecution's case-in-chief on *Miranda* grounds.

### 1. *Background*

Prior to trial, defendant moved to exclude a correctional officer's testimony about an admission that defendant made when he was arrested in 2010 for the current charges and brought to jail for booking. According to the correctional officer, during a routine booking inquiry about the reason for defendant's arrest (designed to determine whether an inmate should be segregated for safety reasons), defendant said he was arrested for molesting his daughter. As the officer continued to inquire about what happened and whether defendant did it, defendant told the officer that the charges were true and he provided details until the officer became upset and told defendant not to tell him anything more.

The prosecution conceded the evidence was inadmissible in the prosecution's case-in-chief because defendant had earlier invoked his *Miranda* right to silence and he was not provided additional *Miranda* warnings when he made the admission.[9]

At sentencing after the jury's guilty verdict—for purposes of evaluating the credibility of defendant's mother's claim at the sentencing hearing that defendant had never molested Doe—the court stated it would consider the correctional officer's statement that defendant admitted molesting Doe when he was booked for the current charges. While addressing the court at sentencing, defendant's mother stated that when defendant pled guilty in 1998 he "took the fall in order to keep his family together," explaining that he pled guilty so his children would be taken out of foster care and returned to his wife, charges which had also been filed against his wife would be dismissed, and his wife (who was not a citizen) would not be deported. Defendant's mother maintained that Doe's mother was responsible for the molestation charges against defendant, and in support raised a variety of claims concerning the bad character of Doe's mother and her influence on Doe.

After hearing the statements from defendant's mother and other individuals, the court said that it would consider defendant's excluded admission to the correctional officer solely for purposes of evaluating the credibility of defendant's mother's claim that defendant never molested Doe. The court emphasized that when evaluating the crimes of

---

9      The correctional officer's testimony about defendant's non-*Mirandized* admissions was presented during an Evidence Code section 402 hearing at defendant's first trial, at which time the court excluded the testimony. At defendant's second trial, the prosecutor conceded the evidence was inadmissible.

which defendant was convicted by the jury, it would not consider the non-*Mirandized* admission but would only consider the evidence presented at trial.

Thereafter, the court explained at length the reasoning underlying its sentencing decisions. The court rejected the claim that defendant pled guilty in 1998 to protect his wife from being prosecuted. The court stated it was "very clear" from defendant's various statements (including to Detective Crisp, a mental health professional, and a probation officer) that he committed the molestation charged in the 1998 case; during this time period defendant explained his inability to control his urges and he requested and received mental health treatment; and he served about eight months in jail and was eventually reunited with his family. When defendant returned to his family, he resumed the molestation, committing it on multiple occasions; the jury convicted him of seven separate offenses; and the offenses were "horrific acts by somebody who was clearly and unquestionably a child molester, who could not or would not be helped . . . ."

The court elaborated that although defendant's family members may believe he is not a child molester, it was clear to the court that defendant "molested his own daughter repeatedly, that he did it over a significant period of time in different locations, that he knew what he was doing, he planned out many of them, not all of them, and he did it repeatedly for his own sexual gratification . . . . [¶] . . . [H]e just chose not to seek help, which he was very well aware of, he knew where he could get it. . . . He chose instead to revictimize [Doe] over again . . . . [¶] The nature of the molestations was horrific, and there was even testimony of an animal involved, and it just doesn't get worse than the conduct [defendant] engaged in in this particular case. [¶] *Each of the facts that were*

31

*found true by the jury* that the Court is going to sentence on, they were all separate. . . . [¶] *So the acts that the jury found true beyond a reasonable doubt* were just one of many that he engaged in for a period of many, many years. [¶] I do find that *given all the evidence in the case*, including the statements made by [defendant] in the 1998 case that were admitted before the jury in this trial, as well as considering *all of the evidence that was presented during the course of the trial* including the victim's testimony, that the acts were committed. [¶] . . . *The victim was very credible* as far as her telling what she could about when they occurred. [¶] She testified as to each of the actions. She had made disclosures to people early on. And she ultimately made disclosures and reported it to law enforcement when she became older and was able to detail those out in more particularities." (Italics added.)

The court set forth additional matters concerning the case, including a statutory requirement that it impose consecutive sentences, and ultimately imposed a term of 300 years to life plus a 34-year determinate term.

### 2. *Analysis*

Assuming, without deciding, that at sentencing the court could not properly consider defendant's non-*Mirandized* admission to the correctional officer, the record shows defendant's incriminating statements to the correctional officer were of minimal consequence at the sentencing hearing; hence, any error was harmless beyond a reasonable doubt. (*People v. Thomas* (2011) 51 Cal.4th 449, 498 [harmless beyond a

reasonable doubt standard applies to *Miranda* error at penalty phase of capital case].)[10]

The court emphasized that it was considering the non-*Mirandized* admission for the narrow purpose of evaluating the credibility of defendant's mother's belief that defendant was innocent. When the court explained the reasoning underlying its sentencing decisions, it focused on the evidence presented at trial and other matters properly before it. The court delineated its view of the trial evidence, found Doe to be credible, and concluded defendant's guilt was clearly established.

We have no doubt the court's sentencing decision would have been the same even without consideration of defendant's admission to the correctional officer. There is no basis for reversal of the sentence on this ground.[11]

### B. *Challenges to $400,000 Victim Restitution Award*

Section 1202.4 requires the trial court, in conjunction with sentencing, to order the defendant to pay restitution to the victim to compensate the victim for economic loss suffered as a result of the defendant's conduct. (§ 1202.4, subd. (f).) Further, when (as here) a defendant is convicted of violating section 288 (lewd act on a child), the court is

---

[10] Although we need not decide the issue, we note there is case authority indicating a sentencing court in a noncapital case may in some circumstances properly consider a defendant's non-*Mirandized* statements. (*United States v. Graham-Wright* (6th Cir. 2013) 715 F.3d 598, 601-604; *People v. Petersen* (1972) 23 Cal.App.3d 883, 896; see generally *White v. Woodall* (2014) __ U.S. __ [134 S.Ct. 1697, 1703] [although privilege against self-incrimination applies at penalty phase, it may not apply in the same manner as at guilt phase].)

[11] Given our holding, we need not evaluate the People's contention of forfeiture concerning this issue.

required to include noneconomic losses in the victim restitution award. (§ 1202.4, subd. (f)(3)(F).)[12]

On appeal, defendant raises an *Apprendi* challenge to the victim restitution award, and contends the amount of the award is unsupported by the record and excessive.

### 1. Apprendi *Challenge*

Defendant argues the victim restitution award to Doe for her noneconomic losses violated his jury trial rights under *Apprendi* because the trial court, not the jury, made the findings concerning the award.

Under *Apprendi* and its progeny, a defendant has the right to have the jury, not the trial court, decide any facts that increase the defendant's punishment beyond the maximum punishment that could otherwise be imposed based on the jury verdict alone. (*Alleyne v. United States* (2013) 133 S.Ct. 2151, 2158, 2160 (*Alleyne*); *Southern Union*

---

[12]    Section 1202.4 states in relevant part: "(a) . . . [¶] (3) The court, in addition to any other penalty provided or imposed under the law, shall order the defendant to pay . . . the following:  [¶] . . . (B) Restitution to the victim or victims, if any, in accordance with subdivision (f), which shall be enforceable as if the order were a civil judgment. . . .  [¶] . . . (f) . . . in every case in which a victim has suffered economic loss as a result of the victim's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court.  If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the amount shall be determined at the direction of the court. . . . [¶] (1) The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution. . . . [¶] . . . . (3) To the extent possible, the restitution order shall be prepared by the sentencing court, shall identify each victim and each loss to which it pertains, and shall be a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following: [¶] . . . . (F) Noneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288."

*Company v. U.S.* (2012) 132 S.Ct. 2344, 2350 (*Southern Union*); *People v. Black* (2007) 41 Cal.4th 799, 812.) The *Apprendi* rule is designed to safeguard a defendant's right to have a jury decide all the elements of an offense beyond a reasonable doubt, and it extends the jury factfinding requirement to sentencing factors that are viewed as akin to elements of the offense because they increase the punishment for the offense above what is otherwise statutorily prescribed. (*Alleyne, supra*, at pp. 2157-2160; see *Oregon v. Ice* (2009) 555 U.S. 150, 170.) Thus, when a statute requires the trial court to increase the punishment based on a finding beyond the jury's verdict, or forbids the trial court from increasing the penalty without the particular finding, the finding is deemed to equate with an element of the offense that must be decided by the jury, not the court. (See *Alleyne, supra*, at pp. 2155, 2153-2161; *People v. Black, supra*, at p. 812; *People v. Kramis* (2012) 209 Cal.App.4th 346, 350-351.)

For example, in *Alleyne*, the court held the jury, not the trial court, had to find whether the defendant brandished, rather than merely used, a firearm so as to increase a mandatory minimum sentence from five years for firearm use to a mandatory minimum sentence of seven years for firearm brandishing. (*Alleyne, supra*, 133 S.Ct. at pp. 2155-2156, 2160 [jury verdict finding firearm use did not permit increased sentence based on court's finding of brandishing].) Similarly, in *Southern Union*, the court held the jury, not the trial court, had to make findings as to precisely how many days a defendant violated an environmental statute that prescribed a fine for each day of violation. (*Southern Union, supra*, 132 S.Ct. at pp. 2349-2351 [jury verdict finding violations during two-year

period, without specifying number of days violations occurred, did not permit daily fines based on court's determination of number of days].)

However, there are a variety of circumstances in which the *Apprendi* jury factfinding requirement does not apply. For example, the *Apprendi* rule does not apply to judicial factfinding that involves a discretionary selection of a sentence or fine within a range prescribed by statute, rather than a mandatory augmentation of the penalty based on specified facts. (*Southern Union, supra*, 132 S.Ct. at pp. 2352, fn. 5, 2353; *Alleyne, supra*, 133 S.Ct. at pp. 2161, fn. 2, 2163; *People v. Kramis, supra*, 209 Cal.App.4th at pp. 349-352; see *People v. Sandoval* (2007) 41 Cal.4th 825, 844, 846-847.) Also, the rule does not apply to a consequence imposed on the defendant that is collateral to the particular statutorily prescribed penalty for the offense and that does not involve factual determinations historically reserved for jury resolution. (*Oregon v. Ice, supra*, 555 U.S. at pp. 163-164, 168-172 [judicial factfinding for consecutive rather than concurrent sentences outside *Apprendi*]; *People v. Mosley* (2015) 60 Cal.4th 1044, 1059-1060 [judicial factfinding for discretionary sex offender residency restriction outside *Apprendi*].) Further, *Apprendi* does not apply to a consequence imposed on the defendant that the Legislature did not intend to be a penalty, and that is not so onerous or in the nature of a traditional penalty as to be deemed a penalty in effect. (*Mosley, supra*, at pp. 1062-1069 [discretionary sex offender residency restriction is regulatory scheme to protect public and is not penalty for *Apprendi* purposes].)

Applying these *Apprendi* principles, numerous state and federal courts (including California courts) have concluded that direct victim restitution awards fall outside the parameters of the *Apprendi* jury factfinding requirement. (*People v. Wasbotten* (2014) 225 Cal.App.4th 306, 308-309 [*Apprendi* does not apply to direct restitution award for economic losses]; accord *People v. Sweeny* (2014) 228 Cal.App.4th 142, 155; *People v. Pangan* (2013) 213 Cal.App.4th 574, 585-586; *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1184; *People v. Millard* (2009) 175 Cal.App.4th 7, 35-36; *United States v. Rosbottom* (5th Cir. 2014) 763 F.3d 408, 420; *United States v. Green* (9th Cir. 2013) 722 F.3d 1146, 1148-1151; *United States v. Day* (4th Cir. 2012) 700 F.3d 713, 732; *United States v. Wolfe* (7th Cir. 2012) 701 F.3d 1206, 1216-1218; *People v. Commonwealth v. Denehy* (Mass. 2014) 2 N.E.3d 161, 173-175; *State v. Huff* (Kan. App. Ct. 2014) 336 P.3d 887, 901-903; see *People v. Smith* (2011) 198 Cal.App.4th 415, 433-434 [jury trial right under California Constitution for civil cases does not apply to victim restitution award for noneconomic losses in criminal cases].)

The victim restitution statute at issue here (§ 1202.4, subd. (f)(3)(F)) directs the court to compensate the victim for noneconomic losses when a defendant violates section 288. Thus, the jury's section 288 guilty verdict authorizes the award, and the court merely determines the existence and amount of the noneconomic loss. In this circumstance, the court is not making a factual finding that mandates an increase in the particular statutory penalty prescribed for the offense that would otherwise apply, nor is it encroaching upon an area of factfinding traditionally reserved for the jury. Rather, the court is exercising its discretion to assess and calculate the victim's losses so as to impose

a consequence that is collateral to the penalty prescribed for the offense. (*People v. Millard, supra*, 175 Cal.App.4th at p. 36 [victim restitution "does not constitute a sentencing choice by the trial court" within the meaning of the *Apprendi* rule]; *Commonwealth v. Denehy, supra*, 2 N.E.3d at p. 174 ["We distinguish [victim] restitution from punishments such as imprisonment and criminal fines that are accompanied by statutory prescriptions."].) As recognized by the United States Supreme Court in *Oregon v. Ice* when concluding consecutive sentences were outside *Apprendi*: "Trial judges often find facts about . . . orders of restitution. . . . Intruding *Apprendi*'s rule into these decisions on sentencing choices or accoutrements surely would cut the rule loose from its moorings." (*Oregon v. Ice, supra*, 555 U.S. at pp. 171-172.)

Further, a victim restitution award is designed as a civil remedy to compensate the victim for his or her losses, and it is not so onerous or akin to traditional punishment as to be deemed penal in effect. (*People v. Wasbotten, supra*, 225 Cal.App.4th at p. 309; *People v. Pangan, supra*, 213 Cal.App.4th at p. 585; *People v. Millard, supra*, 175 Cal.App.4th at pp. 35-36; see *People v. Harvest* (2000) 84 Cal.App.4th 641, 647-650 [victim restitution is not punishment for double jeopardy purposes; "unlike a [restitution] fine, victim restitution is not expressly and statutorily defined as punishment," and it "is compensation, which does not involve an affirmative disability or restraint, and which has not historically been regarded as punishment"].) As our court explained in *Millard*, the "primary purpose of victim restitution hearings is to allow the People to prosecute an expedited hearing before a trial court to provide a victim with a civil remedy for . . . losses suffered, and not to punish the defendant for his or her crime. . . . [¶] To

the extent a victim restitution order has the secondary purposes of rehabilitation of a defendant and/or deterrence of the defendant and others from committing future crimes, those purposes do not constitute increased punishment of the defendant . . . ." (*People v. Millard, supra*, 175 Cal.App.4th at pp. 35-36.)

Defendant argues that although a victim restitution award for *economic* damages may be nonpunitive, a victim restitution award for *noneconomic* damages should be deemed punitive for *Apprendi* purposes. In support, he argues the noneconomic loss award applies only to defendants convicted of violating section 288; the amount of the award turns on factors related to the circumstances of the crime such as its duration or severity; and there is no "built-in proportionality limitation" since it is not based on actual, demonstrated loss. We are not persuaded. As we explained above, a victim restitution award—whether it be for noneconomic or economic losses—involves factual determinations that are collateral to the particular punishment prescribed for the offense; the award is intended to equate with civil compensation rather than a penalty; and it is not so harsh or in the nature of traditional punishment as to necessitate a penalty classification.

The court's factual findings concerning the direct victim restitution award did not invoke the *Apprendi* rule. Given our holding, we need not address the Attorney General's contention of forfeiture.

### 2. *Claim that Restitution Amount Is Unsupported and Excessive*

Defendant argues the $400,000 restitution award for noneconomic damages must be stricken because it is unsupported by the record and excessive. He contends there was

no substantial evidence that Doe suffered lasting psychological harm, noting she did not appear at the sentencing or restitution hearing, she did not submit a claim, and there was evidence that she was doing well, including attending college, working, and maintaining a stable relationship. He also claims the court failed to adequately explain how it calculated the amount. Further, he asserts that contrary to the holding in *People v. Smith, supra*, 198 Cal.App.4th at page 436, the amount of the noneconomic damage award should be evaluated under an abuse of discretion standard rather than a shocking-to-the-conscience standard.

We need not evaluate the standard of review because the record supports the $400,000 award even under an abuse of discretion standard. (See *People v. Giordano* (2007) 42 Cal.4th 644, 665 ["No abuse of that discretion occurs as long as the determination of . . . loss is reasonable, producing a nonarbitrary result."].) The court reasonably determined that defendant's conduct of molesting Doe during a large part of her childhood caused serious psychological harm and emotional distress to her, and hence a substantial noneconomic loss award was warranted.

At trial Doe described the lack of sexual normalcy and emotional anguish that she has experienced because of the molestation and that she will likely continue to experience for the rest of her life. She expressed similar sentiments when interviewed by probation officers in 2012 and 2013. When interviewed in 2012, Doe initially "expressed courage" and stated she was "ready to be interviewed in order to put this incident behind her." However, when she started talking to the probation officer about the molestation, this "caused her to completely break down and cry. She managed to keep her composure at

times and would take breaks in order to catch her breath. [She] was able to carry out the interview and wiped her tears after every statement she made. [¶] . . . [She] wanted to make the court aware that this incident has affected her tremendously. . . . [¶] . . . [N]ow [as] an adult [she] realizes the horrible nightmare she lived with her father." Doe also told the probation officer she wanted defendant to receive a life sentence, noting that the time defendant would have served pursuant to his earlier guilty plea (later withdrawn) would have been "minimal compared to the time she suffered and will continue to suffer for the remainder of her life." During the 2013 interview, Doe told the probation officer that she is trying to move on with her life; she has yet to undergo counseling "due to her mistrust of men" and she hopes to seek counseling once she finds a suitable counselor; and she "has been permanently impacted to the point [that] talking about it causes emotional pain to return."

At the restitution hearing, defense counsel objected to the court's tentative decision to award $500,000 for noneconomic losses, and requested that the court reduce the award to $250,000. The court stated it had considered Doe's trial testimony and her statements to the probation officers concerning the impact of defendant's conduct on her. Further, it had reviewed civil jury instructions concerning the calculation of past and future emotional distress damages, including CACI No. 3905A and the life expectancy table

included in the CACI instructions.[13]  Based on these considerations, the court concluded $400,000 was an appropriate amount for noneconomic damages.

Doe's statements at trial and to the probation officers support that she has suffered severe emotional trauma because of the molestation, and that the effects of the trauma will likely endure throughout her life.  The court was entitled to credit these statements that defendant's conduct had caused serious, lasting psychological distress to her. Further, the court explained its calculation method, stating that it relied on the guidelines used to determine past and future emotional distress damages in the civil context. Defendant has not shown that the court abused its discretion or otherwise erred in awarding $400,000 for noneconomic losses.

C. *Habitual Sex Offender Sentences Should Be Dismissed Given Imposition of Sentence Under the One Strike Sex Offender Scheme*

For each of counts 1 through 6, the court imposed a sentence of 25 years to life under the One Strike sex offender statute (§ 667.61) based on defendant's commission of a statutorily specified sex offense under a statutorily specified circumstance, and doubled each sentence (to 50 years to life) under the Three Strikes statute based on defendant's prior strike conviction (§ 667, subd. (e)(1)).  Additionally for each of these counts, the court imposed another sentence of 25 years to life under the Habitual Sex Offender statute (§ 667.71) based on defendant's prior sex offense conviction, and doubled the

---

[13]     CACI No. 3905A states that there is no fixed standard for noneconomic damages; the trier of fact must use its judgment to decide a reasonable amount based on the evidence and common sense; and recovery for future damages requires proof that the person is reasonably certain to suffer that harm.

sentence (to 50 years to life) under the Three Strikes statute. The court then *stayed* the habitual sex offender sentences under section 654. Defendant argues the trial court was required to *dismiss*, rather than stay, the sentences imposed under the Habitual Sex Offender statute.

There is a split in authority among the lower appellate courts as to whether the court should stay or dismiss sentences when both the Habitual Sex Offender statute and the One Strike sex offender statute apply. (Compare *People v. Snow* (2003) 105 Cal.App.4th 271, 281-283 [dismiss] and *People v Johnson* (2002) 96 Cal.App.4th 188, 207-209 [dismiss], with *People v. Lopez* (2004) 119 Cal.App.4th 355, 360-366 [stay] and *People v. McQueen* (2008) 160 Cal.App.4th 27, 34-38 [stay].)

Our court has twice concluded that when both the One Strike sex offender sentencing scheme and the alternative Habitual Sex Offender sentencing scheme apply to a defendant's case, the trial court should select which sentencing scheme to apply and then dismiss the sentences for the alternative sentencing scheme. (*People v. Snow, supra*, 105 Cal.App.4th at p. 283 ["Under circumstances in which the alternative sentencing schemes of section 667.61 and 667.71 apply, the sentencing court has discretion to choose one of the sentencing schemes[,] and then must strike or dismiss, rather than stay, the sentence under the other."]; *People v. Johnson, supra*, 96 Cal.App.4th at pp. 207-209.) In the interests of consistency within our division, we conclude this is the appropriate procedure to follow unless and until the California Supreme Court resolves the issue otherwise. Accordingly, we shall modify the judgment to order that the habitual sex offender sentences on counts 1 through 6 be dismissed.

VI.  *Cumulative Effect of Errors*

Defendant contends the cumulative effect of errors at the guilt and sentencing phases of his trial violated his constitutional due process right to a fair trial.  We have corrected the error concerning the habitual sex offender sentences.  The sole remaining possible error was the trial court's reference at sentencing to defendant's non-*Mirandized* admission, which was of minor significance in light of the record as a whole.  Defendant's claim based on the cumulative effect of error is unavailing.

DISPOSITION

The judgment is modified to dismiss the habitual sex offender sentences imposed under section 667.71.  As so modified, the judgment is affirmed.


HALLER, Acting P. J.

WE CONCUR:


McDONALD, J.


IRION, J.