# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-30071

United States Court of Appeals
Fifth Circuit

**FILED**
August 13, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

HAROLD L. ROSBOTTOM, JR.; ASHLEY C. KISLA,

Defendants - Appellants

Appeals from the United States District Court
for the Western District of Louisiana

Before STEWART, Chief Judge, and HIGGINBOTHAM, and ELROD, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Harold Rosbottom and Ashley Kisla were convicted in federal district court of various counts of conspiracy, false oath, and concealment of assets in connection with property of Rosbottom's that was not disclosed in his bankruptcy proceedings. They appeal, alleging various trial and sentencing errors. We affirm.

## I.

In an eleven-count superseding indictment, Rosbottom and Kisla were charged with various criminal counts arising from Rosbottom's bankruptcy proceedings. Specifically, the indictment charged both defendants with conspiracy, in violation of 18 U.S.C. § 371 (Count 1); transfer of assets, in

No. 13-30071

violation of 18 U.S.C. § 152(7) (Count 2); conspiracy to launder money instruments, in violation of 18 U.S.C. § 1956(h) (Count 8); money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i) (Count 9); and concealment of assets, in violation of 18 U.S.C. § 152(1) (Count 11). The indictment charged Rosbottom individually with three additional counts of concealment of assets (Counts 3, 4, and 10) and two counts of false oath and account, in violation of 18 U.S.C. § 152(2) (Counts 5 and 7). It further charged Kisla individually with one count of false oath and account (Count 6). The indictment also sought forfeiture of $1,677,506, an issue which both parties agreed would be determined by the district court.

A jury convicted Rosbottom on Counts 1–3, 5, 7–8, and 10–11, and acquitted him on Counts 4 and 9. Kisla was convicted on Counts 1, 6, and 8, and acquitted on Counts 2, Count 9, and 11. The court sentenced Rosbottom to a total term of imprisonment of 120 months: 60 months each for Counts 1, 2, 5, and 10, to run concurrently; 60 months each for Counts 3, 7, and 11, to run concurrently to each other but consecutively to Counts 1, 2, 5, and 10; and 120 months for Count 8, to run concurrently. It also sentenced him to three years of supervised release and $5,353,102 in restitution. Kisla was sentenced to 60 months of incarceration and three years of supervised release.

Evidence at trial showed the following. Rosbottom was a self-made multi-millionaire who owned over a hundred businesses. Co-defendant Kisla was Rosbottom's employee since 2001 and girlfriend since 2005. In connection with a divorce proceeding in Texas, Rosbottom filed an individual voluntary Chapter 11 bankruptcy petition in the Western District of Louisiana on June 9, 2009. He thus became a debtor-in-possession and was required to file statements of financial affairs and be questioned under oath. In his filings, Rosbottom represented that no property was transferred within the previous two years and was asked to list all property being held for him by someone else.

2

No. 13-30071

Rosbottom did not disclose, neither in original nor amended filings, a series of cashier's checks, a boat, a plane, or a private club membership.

On February 18, 2010, the United States trustee, Frances Hewitt, petitioned for appointment of a Chapter 11 trustee on the grounds that she discovered a $140,000 deposit that Rosbottom made towards the purchase of a boat in March 2009. Former Bankruptcy Judge Gerald Schiff was appointed trustee and took control of Rosbottom's personal bankrupt estate as well as his businesses.

A. The Cashier's Checks

In September 2008, nine months before bankruptcy, a withdrawal of funds from the "Harold L. Rosbottom Business Account" was used to purchase a cashier's check for $230,195. Later that month, an additional $1.3 million was withdrawn from the same account and used to purchase a cashier's check. Rosbottom was remitter and payee on both checks. On March 24, 2009, Tessa Roland, an employee of Rosbottom's, was instructed to remove $290,000 from a safe, take it to Chase Bank, and use it to purchase a cashier's check payable to Rosbottom. Roland gave the check to Kisla in the bank's parking lot.

The concealment alleged in Count 3, and the "proceeds of specified unlawful activity" alleged in Count 8, stem from a series of financial transactions that Rosbottom undertook on June 4, 2009—five days before filing for bankruptcy. Rosbottom converted the $230,195 cashier's check into two cashier's checks of $115,097.50 each and converted the $1.3 million cashier's checks into 13 checks of $100,000 each, with himself as payee. He converted the $290,000 cashier's check into two $145,000 cashier's checks with Rosbottom as remitter and Nitro Gaming, one of Rosbottom's companies, as payee; he then converted those two checks into two other $145,000 checks but payable to Rosbottom with Nitro Gaming as remitter. At the end of these transactions and five days before declaring bankruptcy, Rosbottom thus held

3

No. 13-30071

17 cashier's checks, payable to him personally, totaling $1,820,195. None was disclosed on Rosbottom's personal financial statements in the bankruptcy filings. The false oath counts (Counts 5 and 7) and the money laundering conspiracy count (Count 8) stemmed from Rosbottom's purchase of a boat and plane with the cashier's checks.

i.    The Boat

Twelve of the checks, totaling $1,275,195, were used to purchase a boat, *The Bandalwagon*. Rosbottom entered into an agreement to purchase the boat on May 18, 2009. CCH Charters ("CCH"), a British Virgin Islands corporation, was then formed to purchase the boat, with Kisla as the sole shareholder. Rosbottom assigned the purchase agreement to CCH on July 6, 2009, and the following day assigned to CCH a $140,000 deposit he had previously made for the purchase of a different boat. The twelve cashier's checks were deposited into a trust account with CCH's attorney, and the balance of the sales price ($1,137,506) was paid by wire transfer from that trust account. Rosbottom and his adult son, but not Kisla, attended the closing on July 8, 2009. Allied Marine, who handled the closing, emailed Kisla on September 2009 to explain that CCH had to open a bank account as part of the purchase of the vessel. Kisla replied by email: "I think I understand some of the problem. We are a foreign company, and Harold did not want it traced; so would that mean I need to set up an account in the [British Virgin Islands]?"

Rosbottom's false oath count (Count 5) was based on his testimony under oath at a creditor hearing that Kisla had purchased the boat, in part, with a $550,000 bridge loan from Nitro Gaming and that she used the boat to start a charter company. Rosbottom also answered that he did not know where Kisla got the balance of the purchase price. Kisla's false oath count (Count 6) was based on testimony she gave under oath about the boat on January 27, 2010. When asked where CCH Charters intended to get the money to purchase the

4

boat, Kisla testified that "Nitro was going to give a $550,000 bridge loan . . . And the rest came from all of the savings that I had, and my interest in things." Around this time, Kisla met with Angela Maher, Rosbottom's comptroller, and instructed Maher to make various entries in Rosbottom company books. An email from Rosbottom on February 4, 2010, confirmed the figures Kisla gave, and Maher made the entries. The entries included at $200,000 commission from Ohio River; salary for Kisla; a $195,000 distribution from Nitro Gaming; and a $130,000 distribution from Gaming Solutions (all LLCs of Rosbottom's). Maher testified she saw no supporting documentation for these entries.

ii.  The Plane

The other five cashier's checks were used to purchase a one-half interest in an airplane. Craig Levering, a friend of Rosbottom's, testified that he approached Rosbottom in April 2009 about jointly purchasing a plane. On June 17, 2009, Rosbottom asked his in-house attorney to form a Texas LLC with the name N73CL, LLC (the name a reference to the tail number of the plane) and two members: Levering Aviation, LLC (owned by Levering), and the newly formed Westwind II, LLC, solely owned by Kisla. The next day, two of Rosbottom's cashier's checks totaling $245,000 were deposited into an account of Ohio River, one of Rosbottom's LLCs. A second deposit of $300,000, consisting of three of Rosbottom's $100,000 cashier's checks, was made into another of Ohio River's accounts that same day. Both deposits, totaling $545,000, were wired the following day into an account owned by Houma Inn, another of Rosbottom's LLCs. Later that day, Kisla instructed a Rosbottom employee to send two wires totaling $540,000—representing Westwind II's 50% share of the purchase price—to the North Dallas Bank. The closing for the plane had to occur by June 19, 2009, and occurred that day with Kisla present while Levering was overseas and Rosbottom was hospitalized.

Levering and Rosbottom agreed to split the plane's operating expenses

equally in an account opened for that purpose. Kisla instructed Maher, the Rosbottom comptroller, to wire Rosbottom's $10,000 share to the account, with the note: "You pick what account… just not harold." Maher understood this to mean the money was not to come from Rosbottom's personal accounts, including his "HLR Business Account," due to the bankruptcy.

Levering testified that he offered to buy out Westwind II's share because Rosbottom rarely used the plane. On October 28, 2009, Levering purchased Westwind II's share with a Levering Aviation check for $535,851.70, payable to Nitro Gaming. Westwind II was dissolved on November 2. In December, Levering exchanged the check for a cashier's check payable to Nitro Gaming, which was deposited into Nitro Gaming's account.

Rosbottom's false oath count (Count 7) was based on Rosbottom's testimony under oath at a creditor's hearing in December 2009 that he did not know anything about Westwind II. Rosbottom testified that the creditor's question may be referring to Nitro Gaming having paid for part of a plane because Mr. Levering was out of the country and that Levering had since reimbursed Nitro Gaming.

B. Other Property

     i.  The Ocean Reef Club Membership

Rosbottom was a member of the Ocean Reef Club in Key Largo, Florida. KEH Properties, an entity owned by Rosbottom's four children, owned a condominium in the area. Rosbottom advised a Club employee that the condominium was to be sold and inquired about also selling the club membership. Rosbottom never mentioned he was in bankruptcy, nor did he disclose the membership in his bankruptcy filings. He disputes that he, rather than KEH Properties, owned the membership, though he was the designated user. The trustee discovered the membership before the proceeds from the sale were disbursed to Rosbottom, and $142,006.51 was tendered with Rosbottom's

No. 13-30071

approval to the trustee.  Rosbottom's concealment of this asset is the basis for Count 10.

## ii.  The Sandestin Property

On April 17, 2012, the bankruptcy court issued an order permitting the trustee to enter Rosbottom's house in Miramar Beach, Florida (the "Sandestin Property") to inventory its contents.  Kisla and Rosbottom were present at the inventory.   Kim Thayer, chief financial officer of the Rosbottom entities, provided Rosbottom with a copy of the court order, which advised that Rosbottom was prohibited from removing any personal property from the Sandestin residence.  Thayer later learned that Rosbottom and Kisla had rented trucks and moved the home's contents to a property belonging to Kisla's mother in Louisiana.  When the contents were located and inventoried, items were missing.  Rosbottom's actions in connection with the Sandestin property formed the basis of Count 11 of the superseding indictment.

## II.

Rosbottom's and Kisla's first challenge is that this Court must reverse their conviction because the district court failed to remove a juror who stated he was a "duty sworn Reserve Deputy Marshall," prompting the defense to exercise a peremptory challenge to bar that juror from service.  The Jury Selection and Service Act of 1968[1] (the "Jury Selection Act") requires each district court to establish a "plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 and 1862 of this title."[2]  Among other requirements, the plan must "bar[] from jury service on the ground that they are exempt . . . members of the fire or police

---

[1] 28 U.S.C. § 1863 *et seq.*

[2] 28 U.S.C. § 1863(a).  Those objectives are providing all litigants in federal courts with a jury "selected at random from a fair cross section of the community," without discrimination on the basis of membership in a protected class, and ensuring all qualified citizens have an opportunity to serve.  28 U.S.C. §§ 1861, 1862.

departments of any State . . . or any subdivision of a State."[3]  The Jury Plan for the Western District of Louisiana adopts this language.[4]

The Government argues that Rosbottom and Kisla waived their challenge to juror Nash by failing to comply with the requirements of the Jury Selection Act, which provides:

> In criminal cases, *before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier*, the defendant may *move to dismiss the indictment or stay the proceedings* against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.[5]

Subsection (d) states that upon the filing of a motion under subsection (a), "containing a sworn statement of facts which, if true, would constitute a substantial failure to comply" with the Jury Selection Act, the moving party is entitled to present evidence; if the court finds a substantial failure to comply, it shall stay the proceedings pending the selection of a grand or petit jury in conformity with the Act.[6]  Subsection (e) clarifies that "[t]he procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title."[7]

The Friday before the Monday on which trial commenced, questionnaires for seventy-five potential jurors were made available to defense counsel. Included was a questionnaire for Randy Nash, juror #48, who reported his employer was "Teeco Safety Inc.," his type of work was "police sales," and that he was a "reserve deputy Bossier City Marshal."  On Monday morning, during

---

[3] 28 U.S.C. § 1863(b)(6).
[4] Western District Plan, § 7 (as amended Feb. 22, 2013).
[5] 28 U.S.C. § 1867(a) (emphasis added).
[6] 28 U.S.C. § 1867(d).
[7] 28 U.S.C. § 1867(e).

voir dire, Nash identified himself as law enforcement and stated this would not affect his judgment in the case. The defense objected verbally on the basis of the statutory exemption. The judge declined to remove him, having determined that Nash's employment did not disqualify him under the statute. The defense exercised a peremptory challenge to bar Nash from the jury. Within seven days, but after trial, the defense filed a motion and sworn statement moving for a mistrial or stay.

Because Rosbottom did not file his motion or sworn statement that § 1867(d) requires before the voir dire examination began, his claim is untimely. We disagree with appellants' argument that the defense reasonably could not have learned before voir dire that juror Nash was exempt. If, as appellants claim, Nash's statement that he was employed as a "reserve deputy marshal" is sufficient to disqualify him categorically from jury service, the defense had all the information it needed to timely object before the voir dire examination began. In any event, this Court has explained that the Jury Selection Act "is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge."[8] This is the Act's tradeoff: "In the Act, Congress set out a uniform, relatively strict scheme for jury selection. Congress included a new remedy for substantial violations of the Act, regardless of whether the litigant challenging the jury had been prejudiced by the jury selection. As a price for this remedy, Congress was entitled to exact strict compliance with formal procedural rules."[9] And we have determined that Congress required strict timeliness in the filing of the sworn statement required by § 1867(d) even where a defendant's oral objection provides notice

---

[8] *United States v. Bearden*, 659 F.2d 590, 595 (5th Cir. Unit B, 1981) (citing *United States v. Hawkins*, 566 F.2d 1006 (5th Cir. 1978)); *United States v. Kennedy*, 548 F.2d 608 (5th Cir. 1977).

[9] 659 F.2d at 595 (quoting *Kennedy*, 548 F.2d at 613).

No. 13-30071

to the trial court.[10] "Congress left no room for ad hoc review of the usefulness of compliance with [the sworn statement] requirement. Absent some indication from particular circumstances that counsel could not reasonably have been expected to comply with the procedural prerequisites to a statutory challenge to the jury, the claim under the Act will be forfeited by noncompliance."[11] Finding "no such circumstances excusing the omission of the sworn statement" within the time frame Congress required, we hold Rosbottom's and Kisla's claim to be barred.[12] Nor do we find any support for Rosbottom's claim that any error in the trial court's refusal to remove Nash requires reversal of his conviction. "It is obvious that the commencement of voir dire is the cut-off point for challenges under the Act,"[13] both under its express terms and because the only remedy it provides is a stay in the proceedings until a jury can be selected in conformity with the statute.[14] That ship has sailed.

## III.

Rosbottom and Kisla next contend that their rights to present a defense, to confront and cross-examine witnesses against them, and to a fair trial were violated by the district court's limitation of further questioning into the Chapter 11 trustee's alleged bias. We review alleged violations of a defendant's Sixth Amendment confrontation right and right to present a complete defense de novo, subject to harmless error review.[15] If there is no constitutional

---

[10] *See Kennedy*, 548 F.3d at 610–13.

[11] *Id.* at 613.

[12] *See id.*

[13] *United States v. Price*, 573 F.2d 356, 361 (5th Cir. 1978); *see also United States v. Pofahl*, 990 F.2d 1456, 1466 (5th Cir. 1993).

[14] 28 U.S.C. § 1867(d) ("If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.")

[15] *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008) (citations omitted).

violation, we review a district court's limitations on cross-examination for an abuse of discretion, which requires a showing that the limitations were clearly prejudicial.[16]

The defense called trustee Gerald Schiff to the stand as part of its case-in-chief.  It used the direct examination almost entirely to elicit impeaching information to expose Schiff's alleged bias in favor of classifying Rosbottom's property as personal rather than business assets to maximize his compensation as trustee.  The district court allowed some questioning into these matters, and the jury heard significant testimony about Schiff's role and compensation structure.  But the court sustained objections to additional inquiry, ruling it irrelevant.

"While the scope of cross-examination is within the discretion of the trial judge, this discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment."[17]  "The district court has 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'"[18]  A defendant's rights under the Confrontation Clause are "generally satisfied when the defendant has been 'permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.'"[19]  On appeal, the burden falls on the defendant to establish that a "'reasonable jury might have received a

---

[16] *Id.* (citations omitted).

[17] *Skelton*, 514 F.3d at 438 (internal quotation marks omitted).

[18] *Id.* at 439 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

[19] *Id.* (quoting *United States v. Restivo*, 8 F.3d 274, 278 (1993)).

significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination.'"[20] Finally, any violation of the confrontation right is subject to harmless error review.[21]

Rosbottom and Kisla cannot meet their burden here. Although the record shows reason to question the credibility and motives of the bankruptcy trustee, it does not do so in a way relevant to whether Rosbottom and Kisla concealed assets. Schiff's role in classifying the Club membership and Sandestin residence as Rosbottom's property was weak, and his classifications were corroborated by other witnesses. As Schiff was not a Government witness and offered no substantive evidence against appellants at trial, appellants were not faced with the need to impeach his credibility to undermine the Government's case. To the limited extent that Schiff's credibility is relevant to his role in classifying assets, the defense "was nonetheless 'permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness'"[22]—including, as discussed above, that Schiff controlled Rosbottom's LLCs, retained his own law firm, and could be paid on commission. Any error in excluding additional inquiry was harmless because appellants retained "ample room to explore the issue" of Schiff's bias at trial.[23]

IV.

Rosbottom and Kisla also challenge the sufficiency of the evidence against them. They have a difficult burden to meet. "In reviewing the sufficiency of the evidence, we view the evidence and the inferences drawn

---

[20] *Id.* at 439 (quoting *Van Arsdall*, 475 U.S. at 680).

[21] *Id.* at 440 (quoting *Van Arsdall*, 475 U.S. at 680).

[22] *Id.* at 443 (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)) (internal quotation marks omitted).

[23] *See id.*

therefrom in the light most favorable to the verdict, and we determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt."[24]  Our review is not one of the evidence's credibility, but merely of its sufficiency.[25]

A. Conspiracy to Commit Money Laundering

Rosbottom and Kisla were convicted of conspiracy to commit money laundering,[26] which requires "that there was an agreement between two or more persons to commit money laundering, and . . . that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose."[27]  They were acquitted of money laundering, which prohibits using the proceeds of a specified unlawful activity: "(i) with the intent to promote the carrying on of specified unlawful activity [the promotion prong];" or "(ii) knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [the concealment prong]."[28]

The parties dispute both whether the Government can rely on the promotion prong of the statute to support the conspiracy conviction and whether the evidence suffices.  The indictment alleged both prongs, and the jury instruction charged the elements of conspiracy.  But the jury instruction regarding the substantive money laundering offense stated generally that 18 U.S.C. § 1956(a) makes it a crime to both promote and conceal the proceeds of criminal activity, then charged the jury only with the elements of the concealment prong.  Appellants argue that the Government cannot now defend

---

[24] *United States v. Brown*, 553 F.3d 768, 780 (5th Cir. 2008) (internal quotation marks omitted).

[25] *Id.*

[26] 18 U.S.C. § 1956(h).

[27] *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006).

[28] 18 U.S.C. § 1956(a)(1)(A)–(B).

No. 13-30071

its conviction on the promotion prong that was not charged to the jury. But their claim confuses the conspiracy to commit money laundering with money laundering itself. "It is settled law that conspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy."[29] Here, appellants cannot challenge the conspiracy conviction by relying on an element missing from the charge on the substantive crime of which they were acquitted. No elements of the crime of conspiracy were missing from the conspiracy charge, and the jury instructions described how the substantive offense could be committed by promotion or by concealment.

The evidence at trial, moreover, is sufficient to support the conspiracy conviction on either prong. The concealment prong is satisfied by proof defendants "intended to and did make it more difficult for the government to trace and demonstrate the nature of the[] funds."[30] In the light most favorable to the verdict, evidence at trial established that when he filed bankruptcy, Rosbottom possessed, but did not disclose, 17 cashier's checks payable to him personally and totaling over $1.8 million; that some of the funds for the checks were withdrawn by, or at the direction of, Kisla; that the checks were used to purchase the boat and plane, with both assets placed in the name of shell companies allegedly owned by Kisla; that the cashier's checks were put through a series of unnecessary financial transactions designed to make them difficult to trace and hide Rosbottom's ownership; that Kisla's emails exposed their joint intent that the transactions not be traced; that business accounts were used make it appear the source of the funds was Kisla and not the bankrupt estate; and that false testimony at creditor's hearings was intended to conceal the source of the funds from the trustee. We see no reason to disrupt

---

[29] *United States v. Threadgill*, 172 F.3d 357, 367 (5th Cir. 1999).

[30] *Brown*, 553 F.3d at 787.

14

the jury's verdict here.

B. Kisla's Convictions of Bankruptcy Conspiracy and False Oath

Kisla contends that her convictions of bankruptcy conspiracy and false oath were insufficiently supported because the evidence shows only that she was Rosbottom's employee and girlfriend, with minimal involvement in Rosbottom's accounting. But this argument must fail because her convictions were supported by ample evidence. The record showed Kisla was intimately involved with many aspects of Rosbottom's finances, and that she picked up the funds for one of the concealed cashier's checks in a parking lot after another employee took the funds out of the safe. She was the sole member of the shell corporations she helped establish to purchase the boat and plane, though both the boat and plane were under Rosbottom's control and neither was purchased using her funds. All the while, Kisla was aware that Rosbottom was in bankruptcy proceedings, and she testified falsely at creditor's hearings that the funds were hers. Taken together, a reasonable jury could conclude that Kisla and Rosbottom worked in concert to conceal funds from the bankruptcy proceedings and that both contributed overt acts to further their agreement.[31]

The false oath count similarly is supported by ample evidence. The indictment charged that Kisla knowingly perjured herself at a creditor's hearing on January 22, 2010, when she testified that the funds used to purchase *The Bandalwagon* came from a $550,000 bridge loan from Nitro Gaming with the rest coming from her savings and interests. Kisla proffers that there is insufficient evidence to prove the "knowingly and fraudulently" element of the false oath count because she was stating what Nitro Gaming was going to do, not what it actually did, and that she did not know how the money was actually paid at the closing of the vessel since she was not present.

---

[31] *See United States v. Coleman*, 609 F.3d 699, 703–04 (5th Cir. 2010).

No. 13-30071

The jury was free to disregard this unsupported theory. Evidence at trial showed that the money for the purchase of the vessel actually came from the cashier's checks, which Kisla helped procure; that Kisla was involved in setting up the accounts to purchase the vessel, and in doing so sent an email stating that Rosbottom did not want the funds to be traceable; that CCH Charters, of which Kisla was the sole shareholder and owner, never used the vessel for charters; and that Kisla directed an employee to make post hoc accounting entries, unsupported by any documentation, to corroborate her claims. Because a reasonable jury could conclude on this evidence that Kisla knew her statement was false, her conviction stands.

## V.

Rosbottom contends that the restitution award entered against him was illegal because there was insufficient evidence tying the amount to his illegal conduct and because the amounts of restitution and forfeiture were not determined by the jury. We ordinarily apply de novo review to a restitution award's legality, and clear-error review to the factual findings underlying the award.[32] But because Rosbottom failed to object in the district court to the restitution order, we review here only for plain error.[33]

Rosbottom offers no clear basis for finding the district court plainly erred. The district court ordered restitution of $5,343,102, adopting in whole the calculations in Appendix A of the amended pre-sentence report ("PSR"). "In making factual determinations at sentencing, the district court is entitled to rely upon the information in the PSR as long as the information bears some

---

[32] *United States v. Read*, 710 F.3d 219, 231 (5th Cir. 2012).

[33] *United States v. Maturin*, 488 F.3d 657, 659–60 (5th Cir. 2007) (citing *United States v. Howard*, 220 F.3d 645, 547 (5th Cir. 2000)); *United States v. Miranda*, 248 F.3d 434, 443 (5th Cir. 2001).

indicia of reliability.'"[34]   Rosbottom must "'bear[] the burden of presenting rebuttal evidence to demonstrate that the information in the PSR is inaccurate or materially untrue.'"[35]   But his contentions about "enigmatic" loss calculations, not raised below and raised in only a conclusory manner here, provide insufficient basis on which to find the district court plainly erred.

Nor do we find merit in Rosbottom's contention that the restitution and forfeiture award must be vacated because the Fifth and Sixth Amendments entitled him to a jury determination of forfeiture and restitution.  Rosbottom argues that the Supreme Court's holding in *Southern Union Company v. United States*[36]—that the holding of *Apprendi v. New Jersey*[37] applies to criminal fines, such that any fact that increases a defendant's maximum fine must be found by a jury—applies to any fact that increases the amount of forfeiture or restitution.

These claims are foreclosed by our precedent.  With respect to forfeiture, we held in *United States v. Simpson*[38] that, "there [being] no statutory (or guideline) maximum limit on forfeiture," the amount of forfeiture need not be submitted to the jury.  This Court also rejected Rosbottom's argument with respect to restitution in *United States v. Read*,[39] where we explained that "*Apprendi* is inapposite because no statutory maximum applies to restitution."

VI.

Finally, Rosbottom argues that his sentence is procedurally unreasonable because the district judge stated that he "selected th[e] sentence

---

[34] *United States v. Morganfield*, 450 F. App'x. 400, 401 (5th Cir. 2011) (quoting *United States v. Scher*, 601 F.3d 408, 413 (5th Cir. 2010)) (per curiam) (unpublished).

[35] *See id.*

[36] 132 S. Ct. 2344, 2350 (2012).

[37] 530 U.S. 466 (2000).

[38] 741 F.3d 539, 559–60 (5th Cir. 2014).

[39] 710 F.3d 219, 231 (5th Cir. 2012).

considering all the factors of [18 U.S.C. §] 3553(a), your history, your personal characteristics, and your involvement in the instant offense," without explaining how the factors applied. Appellate review of sentences imposed by the district court looks first for procedural error and then for substantive reasonableness.[40] "When there are no procedural errors, this court will then 'consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard' and will 'take into account the totality of the circumstances.'"[41]

Rosbottom's sentence is "not procedurally unreasonable because the record shows that the court weighed the evidence and mitigating factors."[42] Rosbottom argued each of the § 3553(a) factors separately in a sentencing memorandum, and reiterated his arguments for a below-guidelines sentence at the sentencing hearing. And "even assuming, *arguendo*, that the court erred by failing to adequately explain its reasons for imposing" Rosbottom's sentence, he cannot show that this error affected his substantive rights because he makes no claim—there being none—that the court's error would have changed his sentencing outcome.[43]

Rosbottom also argues that a sentence of 120 months is substantively unreasonable in a bankruptcy fraud case where the concealed assets were recovered and creditors will be paid in full. But Rosbottom's "sentence is presumed to be reasonable because it falls within the properly calculated range."[44] Rosbottom's counsel made arguments for a below-guidelines

---

[40] *United States v. Alvarado*, 691 F.3d 592, 596 (5th Cir. 2012) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).

[41] *Id.* at 596 (quoting *United States v. Rodriguez*, 660 F.3d 231, 233 (5th Cir. 2011)) (citing *Gall*, 552 U.S. at 51) (internal quotation marks omitted).

[42] *Id.*

[43] *See id.* at 597.

[44] *Id.*

No. 13-30071

sentence, and the record shows that the court considered these arguments and evidence in light of the § 3553(a) factors prior to imposing the sentence.[45] Thus, we hold that the district court did not abuse its discretion, and Rosbottom's "mere belief that the mitigating factors presented for the court's consideration should have been balanced differently is insufficient"[46] to disturb his sentence here.

## VII.

For the reasons stated above, we AFFIRM as to all convictions, sentences, and monetary penalties.

---

[45] *See id.*

[46] *Id.*