# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-11631

United States Court of Appeals
Fifth Circuit

**FILED**

January 8, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

JONATHAN KHALID PETRAS; WISAM IMAD SHAKER,

Defendants–Appellants.

Appeals from the United States District Court
for the Northern District of Texas

Before JONES, SMITH, and PRADO, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Jonathan Petras and Wisam Shaker were convicted of interfering with the performance of the duties of a flight crew by intimidation, in violation of 49 U.S.C. § 46504. The defendants appeal on various grounds. Finding no error, we affirm.

I.

Petras and Shaker boarded a flight from San Diego to Chicago. They are

No. 16-11631

Chaldean Christians who were traveling to Chicago with ten other individuals to play in a soccer tournament for Chaldean and Assyrian refugees.[1] The flight had 117 passengers. After an unscheduled layover in Amarillo, the plane made it to Chicago minus Petras, Shaker, and their companions.

The behavior precipitating this case began before the aircraft departed the gate. Flight attendant Victoria Clark testified that Shaker "angr[il]y told her to "move out of the way" as he was coming down the aisle. Petras and Shaker then sat in row 20, with their fellow Chaldean soccer players in rows 20 and 21. As the flight attendants were preparing for takeoff and giving safety demonstrations, some members of defendants' group had their tray tables down, seats reclined, and seatbelts unfastened. Clark had to stop her demonstration more than once to request that they put up their seats and tray tables. Shaker was playing loud music and repeatedly refused Clark's request to turn off the music or use earbuds. Petras also stood up to use the overhead bins after the announcement that everyone must be seated.

After takeoff, the flight attendants began the in-flight drink service. Clark made her way down the aisle serving beverages, but she had a hard time hearing the passengers' drink orders because, as she testified, the Chaldeans were "being loud and obnoxious." Once again, she asked Shaker to turn off his music, but Shaker refused. Petras intervened, telling Clark, "You can't tell us to be quiet."

Clark then began to take drink orders. One man asked about alcohol, and Shaker demanded some as well by saying, "Bring us some alcohol." Clark refused, saying she would not serve them alcohol on the flight. She claimed at trial that she was afraid alcohol would escalate the situation because the group

---

[1] Chaldeans are an ethnic-religious group of people indigenous to Iraq and Syria.

was already boisterous and somewhat noncompliant.

Several members of the group immediately protested Clark's refusal. Shaker said, "We can have whatever we want." He started to rise from his seat toward Clark but got caught in his seatbelt. Petras added, "We can have whatever the fuck we want, and we'll do whatever to get what we want." Petras "slammed" his armrest and tray table up and "lunged" at Clark. Petras was "most of the way" from his seat, and his face "was even" with Clark's. Clark was afraid of being hurt and hurried away to find flight attendant Jamie Bergen in the front of the cabin.

One of the group then hit the call button. Flight attendant Leslie Rouch unwittingly came from the back of the aircraft to answer their call. Petras asked her why Clark was refusing them alcohol. Rouch responded that she did not know and would talk to Clark, but she would not serve them alcohol either. The men immediately protested. Shaker said, "You can't tell us no . . . This is America . . . You can't do that" and rose out of his seat, pointing at her. Rouch told them to "tone it down," but Petras responded that she was a "racist." Feeling "stunned," Rouch walked away and heard Petras again call her a "racist pig" as she left. His tone was "hostile and hateful."

The pilot was alerted to the situation when she stepped out of the cockpit to use the restroom. She saw that Clark "looked scared," and after briefly discussing the situation with Clark, she declared a Level 1 Threat, meaning that the plane had passengers who were being verbally assaultive. The pilot secured the cockpit and began talking about possibly diverting the plane.

Bergen then decided to try her hand at diffusing the situation. She approached the group and asked them what was going on. But they loudly and aggressively told her that the flight attendants could not deny them and were racist. She thus decided to return to her fellow attendants.

3

No. 16-11631

Passenger Tiffany Darge came to the back galley and confirmed that a member of the group called Rouch a "racist pig." Bergen approached the group again and informed them that a passenger had confirmed that they had used inappropriate language. Shaker again rose out of his seat, saying, "Who was saying that; I want to talk to them . . . . You can't talk to me this way. I'm a United States fucking citizen. You won't disrespect me. Not even my mom disrespects me." Bergen described Shaker as "lung[ing] towards" her and unable to get out of his seat because of his seatbelt; she was "worried about him trying to get a hold of [her]." Again, Bergen returned to the front of the aircraft; at this point, the crew began looking for cities to which divert the flight.

A few minutes later, passenger Darge came to the front of the aircraft. She claimed that some of the group had been "threatening" her, "flipping her off," and calling her "fucking ugly." After being informed of this, the pilots made the final decision to divert. The crew did not approach the group again. Bergen asked Clark to stay in the front of the plane "for her own safety," while Bergen "was shaking" and crying during landing. About 45 minutes later, the plane touched down in Amarillo. Police escorted the men from the plane.

## II.

A grand jury charged four men from the group, including Petras and Shaker, with interfering with a flight crew and aiding and abetting, in violation of 49 U.S.C. § 46504 and 18 U.S.C. § 2. Section 46504 provides that any "individual on an aircraft . . . who, by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the [crew]" is criminally liable. The prosecution's theory was that Petras and Shaker, along with their co-defendants, intimidated the crew by using profane, aggressive language and menacing conduct that made the attendants fearful for their safety.

4

No. 16-11631

Petras and Shaker moved to dismiss the indictment, alleging that it failed to state an offense, was unconstitutionally vague and overbroad, and violated the First Amendment. The district court denied the motions, relying on *United States v. Hicks*, 980 F.2d 963 (5th Cir. 1992), which interpreted 49 U.S.C. § 1472(j)—the predecessor to § 46504—and found it constitutional. The government moved in limine to prevent the defense from mentioning the defendants' religious affiliations at trial, fearing the defendants would use their affiliation as part of a group of Christian refugees to generate sympathy; the district court denied that motion.

During voir dire, the prosecution used two preemptory strikes on the only two black veniremen—Jurors 26 and 28. Petras's attorney raised a *Batson* objection.[2] The government replied that Juror 26 had a piercing in her eye and had never flown before and that Juror 28 had flown only once and discriminates based on religion. The defense replied that those reasons were pretextual and pointed to other purportedly comparable jurors who were not struck. The district court overruled the *Batson* objection.

After a six-day trial, the jury convicted Petras and Shaker while acquitting their two co-defendants. Petras was sentenced to seven months' imprisonment and three years' supervised release, Shaker to five months' imprisonment and three years' supervised release. Both were ordered to pay restitution of $6,890 to the airline.

Petras and Shaker appealed. They claimed (1) the district court erred in overruling their *Batson* objection to the prosecution's strikes, (2) the jury instructions were incorrect in defining "intimidation" and providing the mens rea, (3) section 46504 is unconstitutional as violating the First Amendment

---

[2] *See Batson v. Kentucky*, 476 U.S. 79 (1986).

No. 16-11631

and Due Process Clause, (4) the evidence was insufficient for Shaker's conviction, and (5) the district court could not award restitution without jury findings.

## III.

We use a three-step process to evaluate a claim that a prosecutor used preemptory strikes in a racially discriminatory manner. *See United States v. Thompson*, 735 F.3d 291, 296 (5th Cir. 2013). First, the challenger must make a prima facie showing of discriminatory jury selection. *See Hernandez v. New York*, 500 U.S. 352, 358 (1991). Because the district court ruled on the ultimate question of discrimination, this first step is moot on appeal. *Id.* at 359.

Second, the burden shifts to the party accused of discrimination to provide a race-neutral explanation for the strikes. *Id.* at 358–59. The explanation "need not be persuasive, nor even plausible, but only race-neutral and honest." *United States v. Williams*, 264 F.3d 561, 571 (5th Cir. 2001). On appeal, the strike must "stand or fall" on the explanation provided at the time of the ruling. *Miller-El v. Dretke* ("*Miller-El II*"), 545 U.S. 231, 252 (2005). Appellate review of the race-neutral reason is de novo. *Thompson*, 735 F.3d at 296.

Third, "the trial court must determine whether the [challenging party] has carried his burden of proving purposeful discrimination." *Hernandez*, 500 U.S. at 359. "This is quintessentially a question of fact which turns heavily on demeanor and other issues not discernable from a cold record." *Williams*, 264 F.3d at 572. Accordingly, "deference to the trial court is highly warranted," and appellate review is for clear error. *Id.*; *see also United States v. Thomas*, 847 F.3d 193, 209 (5th Cir.), *cert. denied*, 137 S. Ct. 2229 (2017).

Although the defendants allege that the prosecution committed a *Batson* violation by striking Jurors 26 and 28—the only two eligible black jurors—the

6

prosecution offered a race-neutral reason. Its proffered justifications were that Juror 26 had a piercing in her eye and had never flown before and that Juror 28 had only flown once in his life and discriminated against Muslims.[3] These explanations are not, on their face, racially tinged. *See Thompson*, 735 F.3d at 297. Indeed, we have consistently held that features such as facial piercings can serve as legitimate, race-neutral reasons to strike.[4] Thus, the prosecution has offered a race-neutral reason.

Accordingly, we move to the third step, where the defendants have the burden of proving that the prosecution engaged in purposeful discrimination. *Hernandez*, 500 U.S. at 359. Defendants contend that statistics and side-by-side comparisons of white panelists demonstrate purposeful discrimination. The prosecution responds that it was always concerned about anti-Muslim or pro-Christian bias (given that defendants belonged to a group of Christian refugees from the Middle East) and that the side-by-side comparisons are unhelpful because the defendants point to jurors who were not similarly situated. In light of all the evidence, the defendants have not met their burden, and the district court did not clearly err.

Defendants first note that the prosecution struck 100% of the potential black jurors—both of the two eligible jurors who were black. Yet given the low number of black jurors in the first place, that statistic is unhelpful.[5] That is especially true because, as the government points out, both black jurors

---

[3] The prosecution's reasons were substantially similar in front of the jury and outside of its presence.

[4] *See, e.g.*, *Purkett v. Elem*, 514 U.S. 765, 769–70 (1995) (holding that "long, unkempt hair, a moustache, and a beard" could satisfy *Batson*); *United States v. Krout*, 66 F.3d 1420, 1429 n.13 (5th Cir. 1995) (stating that "long hair and a beard," "demeanor," and a "casual attitude" could be valid reasons to strike).

[5] *See Woodward v. Epps*, 580 F.3d 318, 339 (5th Cir. 2009) ("For example, if there are only 3 black members of a 100-member venire panel, i.e., 3% black, there is a weaker argument that exclusion of 100% of the black members evidences purposeful discrimination.").

happened to have little or no flying experience.

To show that the prosecutor's reasons were pretextual, the defendants then attempt to identify similarly situated jurors who were not struck. Regarding Juror 26, the government maintains that the strike was because she had never flown and had an eye piercing. Defendants point to Juror 43, from the alternate pool, who also had never flown. The defendants, however, do not point to any other juror with any kind of facial piercing. For that reason alone, they have not identified any juror who was similarly situated to Juror 26. But even regarding Juror 43's having never flown, defendants admit that Juror 43 was at the very end of the alternate juror pool. Thus, the prosecution could have overlooked Juror 43's lack of flying experience, given that Juror 43 was unlikely to serve on the jury.

Admittedly the question is somewhat closer for Juror 28, whom the prosecutor struck because he had flown only once the past five years (the only time in his life), harbored strong anti-Muslim views, and said he could discriminate against particular religions. Regarding Juror 28's religious views, the prosecution points out that Juror 28 was the only juror to answer affirmatively that he was in favor of a wall to stop illegal immigration, believed there were too many illegal aliens in the country, was in favor of banning Muslims, and thought that there were too many refugees. Indeed, Juror 28, when questioned outside the presence of other jurors—at the request of the defendants—explained his "personal views on religion" and that "it's okay to discriminate based on religion" because "it's some personal responsibility."

Defendants identify seven other jurors who had not flown in the past five years—Jurors 1, 6, 9, 11, 17, 20, and 33. Furthermore, defendants point out that Jurors 20 and 33 also favored banning Muslims from the country. Indeed, defendants note that Juror 33 believed that a 1952 law already banned Islam

No. 16-11631

from the United States but would "have no problem" sitting on this case if "these young men [were] Christians from the Middle East." Since these two jurors had not flown in the past five years, and also harbored some anti-Muslim views, defendants urge that they are similarly situated to Juror 28.

The defendants, however, have not identified any other jurors who had flown only once.[6] In that respect alone, the prosecutor's reason is unlikely pretextual. Yet even overlooking that and examining jurors who had not flown in the past five years, the defendants have not identified similarly situated jurors, given that because Juror 28 was arguably more extreme in his religious views than were Jurors 20 and 33.

For example, neither Juror 20 nor 33 answered affirmatively to all of the aforementioned statements, and neither blatantly admitted that he could discriminate on the basis of religion. Granted, those jurors are neither perfectly identical nor perfectly similar. *See Miller-El II*, 545 U.S. at 247 n.6. The similarities are somewhat striking, but the district court found that "these jurors are distinguishable." Because the trial judge is better able to consider and evaluate the extreme religious views of jurors and their flying experience (or lack thereof), this is precisely the situation in which we defer to the court's well-considered factual determination. *See Williams*, 264 F.3d at 572. Accordingly, the defendants have not established any similarly situated jurors.

Finally, the third step requires considering all of the circumstances, so we look for other circumstantial evidence of pretext. *See Miller-El II*, 545 U.S. at 241. Yet all the other evidence points in favor of the prosecution. For instance, the prosecutor struck for cause Juror 22, a Catholic nun, for being

---

[6] Although the fact that Juror 28 had only flown once was elicited via a specific question from the prosecution, the defendants have the burden to show that the prosecution's reasons were pretextual and thus must show similarly situated jurors.

biased toward Chaldean Christians. Furthermore, the prosecutor moved to exclude all evidence about the defendants' religion, indicating that the prosecutor was actually focused on religion and jurors' potential religious biases. And the lack of flying experience was a common reason for striking Jurors 26 and 28. Therefore, the district court did not clearly err in determining that the prosecutor did not strike Jurors 26 and 28 because of race.

## IV.

Petras and Shaker assert that the district court erred in the jury instructions. Those instructions required proof that "the defendant in question intentionally intimidated a flight crew member," and the instructions defined "intimidation" as "words and conduct [that] would place an ordinary, reasonable person in fear." The defendants first aver that the court should have defined "intimidation" as they initially requested: the "intent of placing the victim in fear of bodily harm or death." Second, the defendants allege that the instructions should have required a specific intent to intimidate, even though they required intentional intimidation. Because the defendants assert that the instructions were wrong as a matter of interpreting § 46504, we review the instructions de novo.[7]

Unfortunately for these defendants, we have precedent squarely on point from which they cannot escape. Our circuit has already upheld materially identical instructions in the context of 49 U.S.C. § 46504's predecessor, 49 U.S.C. § 1472(j).[8] Thus, our rule of orderliness compels the same result here

---

[7] *United States v. Stanford*, 823 F.3d 814, 828 (5th Cir. 2016). Although normally jury instructions are reviewed for abuse of discretion, we review them de novo "when the objection is based on statutory interpretation." *Id.*

[8] *Hicks*, 980 F.2d at 972–73. In *Hicks*, the instructions defined "intimidation" as "words and conduct . . . [that] would place an ordinary, reasonable person in fear," *id.* at 972, and required knowing intimidation, *id.* at 973. The court found that those instructions were correct. *Id.* at 972–73.

No. 16-11631

"absent an intervening change in law, such as by statutory amendment, or the Supreme Court, or our en banc court."[9]

The defendants do not show any intervening change in law warranting a departure from *Hicks*. They aver that *Hicks* interpreted a materially different version of the statute. But the only relevant way that § 1472(j) differs from § 46504 is that the former prohibited "assaulting, intimidating, *or threatening*" a crew member so as to interfere with his or her duties. *See Hicks*, 980 F.2d at 972 (emphasis added). The omission of "threatening" does not materially change the statute, especially because *Hicks* principally relied on general dictionary definitions to define "intimidation." *Id.* at 973. Although *Hicks* also mentioned that § 1472(j) used "threaten" and "intimidate" in the disjunctive, the absence of that single sentence does not change the opinion.[10]

Second, defendants insist that *Virginia v. Black*, 538 U.S. 343 (2003), implicitly overruled *Hicks*'s definition of "intimidation." Specifically, they point to *Black*'s statement that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* at 360. But for a Supreme Court decision to override a Fifth Circuit case, the decision must "'unequivocally' overrule prior precedent"; mere illumination of a case is insufficient.[11]

---

[9] *Vaughan v. Anderson Reg'l Med. Ctr.*, 849 F.3d 588, 591 (5th Cir.) (quoting *Sprong v. Fid. Nat'l Prop. & Cas. Ins. Co.*, 787 F.3d 296, 305 (5th Cir. 2015)), *cert. denied*, 138 S. Ct. 101 (2017).

[10] Moreover, the Ninth Circuit has noted that "threatening" was deleted as "included in 'intimidating.'" *United States v. Naghani*, 361 F.3d 1255, 1260 n.2 (9th Cir. 2004) (citing H.R. Rep. No. 103-180, at 390 (1993)). Accordingly, "intimidating" seems broader than "threatening" and should encompass more conduct than it, lest we declare that Congress had a superfluity in § 1472(j). *Cf. Corley v. United States*, 556 U.S. 303, 315 (2009) (articulating the presumption against superfluities).

[11] *Frazin v. Haynes & Boone, L.L.P* (*In re Frazin*), 732 F.3d 313, 319 (5th Cir. 2013)

No. 16-11631

Closer examination reveals that *Hicks* is still controlling.[12]  In the first place, *Black* was not a statutory-interpretation case but, instead, evaluated the constitutionality of a Virginia statute that prohibited cross-burning with the intent to intimidate.  *Black*, 538 U.S. at 347–38.  So although *Black* discussed "intimidation" as it was defined in that statute, it did not mandate that *all* statutes with "intimidation" be interpreted accordingly.[13]  Defendants may have a point that *Black* affected the *constitutionality* of § 46504, but they cannot reasonably say that *Black* unequivocally overruled our *interpretation* of § 46504 in the first instance.[14]

Even then, *Black*, *id.* at 360, only established the kind of "intimidation" that constitutes a "true threat."  It said nothing about the constitutionality of laws that criminalize a broader sense of "intimidation," which, as *Hicks* explained, may be valid time, place, or manner restrictions or may survive strict

---

(quoting *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012)).

[12] Since *Black*, the Fourth and Ninth Circuits have reaffirmed *Hicks*'s definition of "intimidation."  *See United States v. Persing*, 318 F. App'x 152, 155 (4th Cir. 2008); *Naghani*, 361 F.3d at 1262.

[13] Indeed, the Court's discussion of "intimidation" was colored by the fact that *Black* was a cross-burning case and that cross-burning is often "designed to inspire in the victim a fear of bodily harm."  *Black*, 538 U.S. at 357; *see also id.* at 363 (stating that "Virginia may choose to regulate this subset of intimidating messages in light of cross burning's long and pernicious history as a signal of impending violence").  In that context, it makes sense that the Court would view "intimidation" as a true threat.

Here, however, the statutory context is that of ensuring safety in air travel, a delicate environment.  Accordingly, it makes sense here to view "intimidation" differently.  *Cf. Tyler v. Cain*, 553 U.S. 656, 662 (2001) (explaining that courts do not "construe the meaning of statutory terms in a vacuum.  Rather, we interpret words in view of their context") (internal quotations omitted).

[14] The only method of linking the interpretation of § 46504 to its constitutionality is the canons of constitutional avoidance or of avoiding unconstitutionality—but such a deduction is precisely the sort of mere illumination, rather than an unequivocal statement, that cannot overcome the rule of orderliness.  *See Frazin*, 732 F.3d at 319.

scrutiny.  *See Hicks*, 980 F.2d at 968–72.[15]  Accordingly, *Black* did not unequivocally overrule *Hicks*'s interpretation of "intimidate" in § 46504.

Defendants point to other Fifth Circuit decisions that defined "intimidation" differently with respect to different statutes.[16]  As explained above, such cases, interpreting different statutes, do not require a departure from *Hicks*'s interpretation of "intimidation" in the context of § 46504.  Thus, the defendants have shown no reason to depart from *Hicks*'s definition of "intimidation" as "words and conduct [that] would place an ordinary, reasonable person in fear."

Defendants then posit that the jury instructions were wrong because they did not require proof that the defendants had the purpose of intimidating a crew member.  Yet they required that "the defendant in question intentionally intimidated a flight crew member."  And *Hicks*, *id.* at 973, held that a jury instruction requiring only "knowing intimidation" was sufficient.  Thus, *Hicks* requires affirmance here absent some intervening change in law.  We find none.

The only case the defendants rely on, *Elonis v. United States*, 135 S. Ct. 2001 (2015), is inapposite.  There the Court examined a federal law that criminalizes communications with threats.  *Id.* at 2004, 2011.  The Court held that the statute required mens rea both as to making the communication and as to the fact that the communication contained a threat.  *Id.*  Again, the Court was interpreting a different statute.  Though it gave a general presumption that criminal statutes contain a mens rea element, it did not mandate that all

---

[15] The Court has repeatedly stated that even regulations on protected speech may survive as time, place, and manner restrictions or may pass muster under strict scrutiny. *See, e.g.*, *Clark v. Comm. for Creative non-Violence*, 468 U.S. 288, 295 (1984); *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1665–72 (2015).

[16] *See, e.g.*, *United States v. Brewer*, 848 F.3d 711, 715–16 (5th Cir. 2017) (holding that bank robbery by intimidation has, as an element, the threatened use of physical force).

No. 16-11631

federal statutes be interpreted as specific-intent crimes. *See id.* Accordingly, *Elonis* did not unequivocally overrule *Hicks*'s holding that § 46504 is a crime of general intent.[17] There is no error in the jury instructions.

V.

We turn to whether § 46504, as construed, is constitutional. We review constitutional claims de novo. *United States v. Hernandez*, 633 F.3d 370, 373 (5th Cir. 2011). Petras and Shaker variously assert that § 46504 violates the First Amendment and the Due Process Clause. Specifically, they claim that the statute violates the First Amendment as applied to them and is overbroad and that the statute is unconstitutionally vague. Yet *Hicks*, 980 F.2d at 968–72, dealt with each of those challenges and rejected them. Thus, again, the defendants must show some intervening change in law, such as a Supreme Court case that unequivocally overrules *Hicks*. *See Frazin*, 732 F.3d at 319. Because the defendants fail in that, we adhere to *Hicks* and reiterate that § 46504 is constitutional.

A.

Defendants raise an as-applied First Amendment challenge. They reason that they are being punished for exercising their free-speech rights in saying, for example, that the flight attendants were racist. But *Hicks*, 980 F.2d at 970–72, rejected a materially identical as-applied challenge. In both cases, the defendants were loud, aggressive, uncooperative, and used profanity. *See id.* at 967–68.[18] And in *Hicks*, the court held that § 1472(j) was constitutional

---

[17] Post-*Elonis*, courts have continued to find general intent crimes in criminal statues dealing with intimidation. *See, e.g.*, *United States v. Williams*, 864 F.3d 826, 829–30 (7th Cir. 2017); *United States v. Ziba*, 653 F. App'x 809, 810 (5th Cir. 2016).

[18] Petras and Shaker attempt to distinguish their case from *Hicks* by insisting that they are being punished for hurling only "non-profane invective." In so doing, they ignore

14

even though it regulated constitutionally protected speech, because (1) § 1472(j) was a legitimate time, place, and manner restriction; and (2) even if § 1472(j) regulated content, it passed strict scrutiny. *Id.* at 970–72. The same analysis applies here.

To escape *Hicks*, the defendants point to *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218, 2226–27 (2015), as indicating that § 46504 cannot be upheld as a time, place, or manner restriction. In *Reed*, the Court held that an ordinance restricting the size, duration, and location of temporary signs was not a time, place, or manner restriction because it applied different standards to different signs based on their content. *Id.* at 2227. Therefore, defendants reason, § 46504 cannot be a time, place, or manner restriction insofar as even incidental regulations of content are content-based after *Reed*.[19]

Yet regardless of whether § 46504 is justifiable as a time, place, or

---

the wealth of evidence presented by the prosecution. In addition to some non-profane statements, Shaker also said, "You can't talk to me this way. I'm a United States fucking citizen," and "lunged" at flight attendants. Meanwhile, Petras stated "We can have whatever the fuck we want, and we'll do whatever to get what we want," while also lunging at the flight crew. These acts are materially similar to those performed by the *Hicks* defendants, who also used a mix of profane and non-profane statements in a loud, angry manner. *See Hicks*, 980 F.2d at 966–68.

[19] *But see Hicks*, 980 F.2d at 971 (justifying § 1472(j) partly on this basis). It is a close call whether *Hicks*'s reasoning as to time, place, or manner restrictions survives *Reed*. On the one hand, § 46504 prohibits "intimidation" on airplanes—which may not turn on what the speaker actually says. For instance, a passenger could conceivably use any combination of words while shouting, acting aggressively, and lunging at flight attendants in a way that is intimidating. Accordingly, it would not matter what content the words contain—all that matters is whether those words and conduct would place an ordinary person in fear.

Thus, § 46504 may not be content-based even under *Reed*, which involved a statute that plainly applied different standards to signs based on what the signs would say. *See Reed*, 135 S. Ct. at 2227. But the Ninth Circuit has indicated agreement with defendants on this point. *See United States v. Cassel*, 408 F.3d 622, 627 (9th Cir. 2005) (stating that a statute that "punishes speech precisely because of the 'intimidat[ing]' message it contains" is a content-based restriction). Ultimately this proves academic in light of the fact that we follow *Hicks* in holding that § 46504 is constitutional as surviving strict scrutiny. *See Hicks*, 980 F.2d at 971–72.

No. 16-11631

manner restriction, defendants have identified no case that would overrule *Hicks*'s determination, 980 F.2d at 971–72, that § 1472(j) is a permissible content-based law. As everyone acknowledges, if § 46504 discriminates based on content, it must survive strict scrutiny. *See Reed*, 135 S. Ct. at 2227. But *Hicks*, 980 F.2d at 971–72, already examined § 1472(j) under strict scrutiny and determined that it passed constitutional muster.

First, in *Hicks* we said that § 1472(j) served the compelling government interest of safety in air travel, given the "special context of air travel—pressurized vessels routinely carrying hundreds of passengers and traveling at speeds of up to 600 miles per hour and 40,000 feet above the ground." *Id.* Second, *Hicks* determined that § 1472(j) was "narrowly tailored" in that its prohibition on "intimidation" "encompasses only a relatively narrow range of speech, which frequently will be a concomitant of intimidating conduct, as in the instant case." *Id.* at 972. At the end of the day, defendants offer nothing to rebut that analysis, which we find to be entirely persuasive and controlling. Thus, the defendants' First Amendment as-applied challenge fails.

B.

Defendants raise an overbreadth challenge to § 46504. They must show a "substantial" chance that the statute will chill the protected speech of third parties not before the court. *See id.* at 969. "An overbreadth challenge is not appropriate if the first amendment rights asserted by a party attacking a statute are essentially coterminous with the expressive rights of third parties." *Id.* Defendants argue that § 46504 is overbroad because it could be used to punish passengers who complain that they were treated unfairly because of their sex or ethnicity. *Hicks* dealt with a similar overbreadth challenge—where the defendants alleged that § 1472(j) would proscribe "non-profane invective"— and rejected it. *Id.* at 969–70.

16

No. 16-11631

The same analysis from *Hicks* applies here. As there, § 46504's potential to criminalize mere complaints about racial discrimination is "too insubstantial to permit an overbreadth challenge." *Id.* at 970. Such complaints would need to place a reasonable, ordinary person in fear and interfere with the duties of the flight crew before they would violate § 46504—an unlikely situation, as we recognized in *Hicks*. *See id.* Thus, even assuming that Congress could not constitutionally proscribe such intimidating complaints, the occurrence of such a case is too unlikely for us to strike § 46504 as overbroad.[20]

C.

Petras suggests that § 46504 is unconstitutionally vague and violates the Due Process Clause. But *Hicks*, 980 F.2d at 972, gave several reasons why § 1472(j) is not unconstitutionally vague; those reasons all apply to this case. For example, as explained above, § 46504 does not "reach a 'substantial' amount of constitutionally protected conduct;" nor is it "impermissibly vague in *all* its applications." *Id.* Thus, defendants cannot raise a facial challenge to § 46504. *Id.* (noting that a facial challenge to a statute for vagueness must establish that the statute "reaches a substantial amount of constitutionally protected conduct"). And § 46504 clearly applies to defendants' conduct; thus, they cannot raise an as-applied challenge. *See id.* (finding that § 1472(j) clearly applied to the similarly-situated defendants in *Hicks*). Finally, even if we were to reach the merits of Petras's vagueness challenge, we would find that "person of ordinary intelligence could foresee that [lunging, yelling, and cursing at] a flight attendant . . . are actions which could inhibit the performance of an attendant's duties" by intimidation. *United States v. Tabacca*, 924 F.2d 906, 913 (9th Cir. 1991). Thus, § 46504 is not so vague as to provide no standard

---

[20] Even if § 46504 reached such conduct, it might pass strict scrutiny, given the compelling government interest in air-travel safety. *See Hicks*, 870 F.2d at 972.

No. 16-11631

"by which to determine the kind of conduct prohibited." *Id.*

## VI.

Shaker maintains that the evidence is insufficient to convict him of violating § 46504. Because he preserved his sufficiency argument at trial, appellate review is de novo. *See United States v. Davis*, 735 F.3d 194, 198 (5th Cir. 2013). The appellate court should review "all the evidence . . . in the light most favorable to the government, with all reasonable inferences to be made in support of the jury's verdict." *United States v. Terrell*, 700 F.3d 755, 760 (5th Cir. 2012) (internal quotation marks omitted). "[R]eviewing courts must affirm a conviction if . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc). Viewing the evidence in the light most favorable to the government, a rational jury could easily have found that Shaker violated § 46504.

First, Shaker maintains that there was insufficient evidence to show that his words and conduct would have placed an ordinary, reasonable person in fear. He attempts to distinguish *Hicks* and insists that he did not threaten anyone, get physical with anyone, or know he was disrupting the flight. But Shaker overlooks the abundance of evidence that shows he was intimidating. For instance, he demanded that Clark bring him alcohol, saying "[w]e can have whatever we want" in an "[a]ngry and aggressive way," while standing up facing her. He later yelled at Rouch, "You can't tell us no," while rising out of his seat and pointing at her. Finally, Shaker aggressively "lunged" at Bergen while saying, "You can't talk to me this way. I'm a United States fucking citizen. You won't disrespect me. Not even my mom disrespects me."[21] Viewed

---

[21] Though defendants maintain that their punishment is really for calling the flight attendants "racist," it is clear from the above-described evidence that that insult was merely

No. 16-11631

in the light most favorable to the government, a reasonable person standing there, in the face of such aggressive behavior and verbal tirades, would be afraid. A reasonable jury could easily find that Shaker intentionally intimidated the flight attendants by yelling such demands and indicating aggression by his physical conduct.

Second, Shaker insists that his actions did not interfere with the attendants' duties. He contends that the only duty he possibly interfered with was the in-flight drink service—and that § 46504 criminalizes only intimidation that interferes with *safety*-related duties, as distinguished from the in-flight beverage service.

Assuming without deciding that § 46504 criminalizes only intimidation with safety-related duties, Shaker still interfered with the duties of the flight attendants to take care of, and generally monitor, all the passengers and the aircraft. Because of Shaker's (and his companions') verbal harassment and aggressive behavior, the flight crew withdrew from the cabin. Moreover, they were afraid to ensure that defendants' tray tables were raised or that their seatbelts were buckled for landing. Those duties manifestly relate to safety.[22] Thus, after viewing the evidence in the light most favorable to the government, a reasonable jury could easily have found that Shaker interfered with the flight crew's safety-related duties. There is no merit to Shaker's sufficiency

---

the crowning moment of a string of verbal abuse and physical aggression.

[22] *See Hicks*, 980 F.2d at 972 (stating that "even the more mundane duties of flight attendants that implicate safety cannot be taken for granted"). Even if Shaker had only interfered with the in-flight drink service, that duty likely relates to safety as well. Indeed, the Department of Transportation requires that food and beverages be provided to passengers delayed on the tarmac for two hours or more. *New DOT Consumer Rule Limits Airline Tarmac Delays, Provides Other Passenger Protections*, DEPARTMENT OF TRANSPORTATION (Dec. 21, 2009), https://www.transportation.gov/briefing-room/new-dot-consumer-rule-limits-airline-tarmac-delays-provides-other-passenger. Although perhaps mundane in most flights, the need for food or drink may at times prove critical to passengers' safety.

19

No. 16-11631

challenge.

## VII.

Petras claims that the district court, by ordering restitution based on its own findings, violated his Sixth Amendment right to a jury finding for any facts that alter his punishment. This circuit has already decided that the Sixth Amendment jury right does not apply to restitution awards. *United States v. Rosbottom*, 763 F.3d 408, 419–20 (5th Cir. 2014). The only Supreme Court case that Petras points to is *Alleyne v. United States*, 133 S. Ct. 2151, 2158 (2013)— but because *Alleyne* was decided before *Rosbottom*, Petras's argument is foreclosed.

The judgments of conviction and sentence are AFFIRMED.